Michael C. LeVine
Katharine S. Glover
Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, Alaska 99801
Ph: 907-586-2751
Fax: 907-463-5891
Email: mlevine@earthjustice.org

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| SOUTHEAST ALASKA CONSERVATION COUNCIL, SKAGWAY MARINE ACCESS COMMISSION, LYNN CANAL CONSERVATION, INC., ALASKA PUBLIC INTEREST RESEARCH GROUP, SIERRA CLUB, and NATURAL RESOURCES DEFENSE COUNCIL, | ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) Case No. J06-_____ CV ) |
| FEDERAL HIGHWAY ADMINISTRATION; UNITED STATES DEPARTMENT OF TRANSPORTATION; MARIA CINO, in her official capacity as Acting Secretary of Transportation; DAVID C. MILLER, in his official capacity as Division Administrator for the Federal Highway Administration; UNITED STATES FOREST SERVICE; UNITED STATES DEPARTMENT OF AGRICULTURE; MARK REY, in his official capacity as Under Secretary of Agriculture; and DENNIS E. BSCHOR, in his official capacity as Alaska Regional Forester. | ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
(5 U.S.C. § 702; 42 U.S.C. § 4332; 16 U.S.C. § 1536; 16 U.S.C. § 1604;
23 U.S.C. §§ 109(a) & (h); 16 U.S.C. § 668)**

# INTRODUCTION

1. This action challenges the defendants' decisions to authorize construction of a road extension and ferry terminal north of Juneau in an inventoried roadless area of the Tongass National Forest. Defendants' actions, together with the Juneau Access Improvements Final Environmental Impact Statement (FEIS), violate the National Forest Management Act (NFMA), National Environmental Policy Act (NEPA), Endangered Species Act (ESA), Administrative Procedure Act (APA), and the Department of Transportation Act.

2. The proposed road extension will traverse Berners Bay and Lynn Canal. That area is one of Southeast Alaska's outstanding natural resources and has been specifically identified by Congress as deserving of special protection. It includes significant old-growth forest, and several areas are protected as Old-Growth Habitat under the Tongass Land Management Plan. The area is home to many species of wildlife including Steller sea lions, which are listed as threatened under the ESA.

3. The plaintiffs are organizations whose members use the affected areas for boating, hiking, subsistence, commercial, and sport fishing, camping, photography, and wildlife viewing, as well as cultural, spiritual, and other activities that depend on the undisturbed nature of the area. These organizations seek declaratory and injunctive relief preventing the defendants from taking any action to implement their decision to authorize road construction, including awarding contracts, approving plans or otherwise authorizing or commencing activities on-the-ground that would cause harm to the environment, and thereby to plaintiff organizations' members, pending compliance with the law.

## JURISDICTION, RIGHT OF ACTION, AND VENUE

4.   This court has jurisdiction pursuant to 28 U.S.C. § 1331 and 16 U.S.C. § 1540(g) and may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§ 2201-02.  Judicial review is available under the Administrative Procedure Act, 5 U.S.C. §§ 701-06, and Endangered Species Act, 16 U.S.C. § 1540(g).

5.   Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).

## PLAINTIFFS

6.   Southeast Alaska Conservation Council (SEACC) is a nonprofit organization of 17 volunteer conservation groups in fourteen communities across the Southeast Alaska panhandle, from Yakutat to Ketchikan, and nearly 1,800 individual members, the majority of whom live in Alaska.  SEACC advocates for the conservation and wise long-term management of the scenic, wilderness, fish, wildlife, recreation, subsistence and other natural resources and values of Southeast Alaska and the Tongass National Forest including the Lynn Canal and Berners Bay area.  SEACC's organizational members include Lynn Canal Conservation and the Juneau Group of the Sierra Club.

7.   Skagway Marine Access Commission is a non-profit organization established for the purpose of promoting the improvement of business and economic conditions in Lynn Canal.  It has worked for the past ten years to support marine transportation in Lynn Canal.  Skagway Marine Access Commission members regularly use and enjoy the Lynn Canal area for ferry transportation to the capital, for transportation for medical purposes, as well as for hiking, fishing, and recreational uses.  Some members are economically dependant on tourism in Skagway and in Lynn Canal.

8.   Lynn Canal Conservation, Inc. is a non-profit, volunteer grassroots conservation organization founded in 1971 and based in Haines, Alaska.  It has approximately 150 members,

all of whom reside in Southeast Alaska. Lynn Canal Conservation works to protect the environment in and around Lynn Canal, including the Berners Bay area. Lynn Canal Conservation's members actively use the Lynn Canal area where the Juneau Access Improvements Project would be constructed. Among other uses, members hike, kayak, fish, birdwatch, and boat in Lynn Canal and enjoy the solitude and natural environment of the area.

9. Alaska Public Interest Research Group (AkPIRG) is a non-profit, non-partisan organization dedicated to public interest research, education, and advocacy. AkPIRG exists to promote the public and consumer interests, and it supports efficient and responsive government on behalf of its 2,000 members statewide. AkPIRG's members use the Lynn Canal region for transportation and recreation.

10. Sierra Club is a national grassroots conservation organization. Sierra Club's members are 700,000 Americans, including about 1,850 Alaska residents, who are inspired by nature. They explore, enjoy, and protect the wild places of the earth including the Tongass National Forest, Lynn Canal, and Berners Bay area. They practice and promote the responsible use of the earth's ecosystems and resources. For over a hundred years they have sought to educate and enlist humanity to protect and restore the quality of the natural and human environment. In Southeast Alaska, the Sierra Club is represented by the Juneau Group of the Sierra Club. Sierra Club members reside in nearly every community of Southeast Alaska, from Yakutat to Ketchikan, and derive benefits and enjoyment from the natural environment including the Tongass National Forest and the Lynn Canal. Members primarily enjoy the natural areas of southeast Alaska, including Berners Bay and the entire Lynn Canal area, for its scenery, wilderness, wildlife, and solitude.

11.     The Natural Resources Defense Council (NRDC) is a non-profit organization dedicated to protection of the earth's environment.  NRDC has over 1,500 members in the State of Alaska and more than 550,000 members in all.  NRDC's involvement in conservation of the Tongass National Forest dates back almost to the organization's inception.

12.     Members of plaintiff organizations reside near, visit, or otherwise use and enjoy Berners Bay, Lynn Canal, and the surrounding area that will be affected by the proposed project. In particular, members of plaintiff organizations use this area for recreation, subsistence, commercial, and sport fishing, wildlife viewing, photography, boating, and aesthetic and spiritual enjoyment.  The plaintiffs and their members derive recreational, subsistence, cultural, aesthetic, and conservation benefits and enjoyment from the area.  Road and ferry terminal construction will directly and irreparably injure these interests.

13.     The plaintiffs participated actively in the planning process for the Juneau Access Improvements Project.  Each of the plaintiff groups submitted comments to FHWA regarding the Supplemental Draft Environmental Impact Statement and FEIS for the proposed project.

14.     The defendants' unlawful actions adversely affect each plaintiff's organizational interests and its members' use and enjoyment of the public lands and resources in the Lynn Canal and Berners Bay area.  The plaintiff organizations monitor the use of forest and other public lands and waters and the compliance with the laws respecting these lands, educate their members and the public concerning management of these lands, and advocate policies and practices that conserve the natural value of these lands.  It is impossible to achieve these organizational purposes fully without adequate information and public participation in the processes required by law.  The interests and organizational purposes of the plaintiffs are directly and irreparably injured by the defendants' violations of the laws as described in this complaint.

## DEFENDANTS

15.     Defendant Federal Highway Administration is an agency of the United States Department of Transportation.  It is responsible for ensuring a safe, secure, and environmentally sound national road system.

16.     Defendant United States Department of Transportation is the department of the executive branch responsible for overseeing transportation infrastructure and systems.

17.     Maria Cino is sued in her official capacity as Acting Secretary of Transportation.

18.     Defendant David C. Miller is sued in his official capacity as Division Administrator for the Federal Highway Administration.

19.     The full name of Defendant United States Forest Service is United States Department of Agriculture, Forest Service.  It is an agency of the Department of Agriculture entrusted with the administration of the national forests, including the Tongass National Forest.

20.     Defendant United States Department of Agriculture is the department of the executive branch responsible for overseeing the activities of the Forest Service.

21.     Mark Rey is sued in his official capacity as the Under Secretary, Natural Resources and Environment, United States Department of Agriculture

22.     Defendant Dennis E. Bschor is sued in his official capacity as United States Forest Service Region 10 Regional Forester.

## FACTS

23.     Currently, Juneau is not connected by road to the state or national highway system.  The northern end of the road system in Juneau is at Echo Cove, which is approximately 40 miles north of the center of town.  The road ends approximately five miles south of the center of town.

24.     The Alaska Marine Highway System serves Juneau.  Ferry service has operated in
Lynn Canal since the 1960s and, currently, connects Juneau to Haines and Skagway using both
conventional and fast vehicle ferries.  The Alaska Marine Highway also connects other towns in
Southeast Alaska to Juneau and to each other.  The Lynn Canal routes between Juneau, Haines,
and Skagway comprise the most lucrative corridor on the Alaska Marine Highway System.

25.     The Alaska Department of Transportation and Public Facilities (DOT) and
Federal Highway Administration (FHWA) propose to extend the highway 50.8 miles north from
Echo Cove to the Katzehin River delta.  A new ferry terminal is proposed to be constructed at the
Katzehin, and passengers would board shuttle ferries there to travel to Haines or Skagway.  The
shuttle ferries are planned to depart the Katzehin terminal for Haines and Skagway
approximately every two hours between 8 am and 8 pm.

26.     The new shuttle ferries, road extension, and ferry terminal would be constructed
using a combination of state and federal funds.  Currently, construction is estimated to cost
approximately $258 million.  Of that amount, approximately $67.2 million will come from state
general funds.  The state funds include direct appropriations of approximately $57.5 million.
The state funds also include approximately $9.7 million to match the federal funds that would be
used.

27.     The chosen alternative would cost more to maintain and operate than the existing
ferry service in Lynn Canal.

28.     The road portion of the proposed project would traverse 36 avalanche chutes.  The
road would be closed during those portions of the year when weather or avalanche danger
precluded travel.  DOT and FHWA estimate that the road will be closed more than 30 days per

year.

Recreation and Wildlife Values

29.     The proposed highway extension would be constructed entirely within an inventoried roadless area encompassing more than 1.2 million acres in the Tongass National Forest.  The area is generally unmodified and natural.  It provides a very high opportunity for solitude and primitive recreation, and it scores very high for qualities such as natural integrity, apparent naturalness, outstanding opportunity for solitude, and primitive recreation opportunities.

30.     The Lynn Canal and Berners Bay area affected by the proposed road and ferry terminal project provides important habitat for hundreds of wildlife species, including brown and black bears, mountain goats, Sitka black-tailed deer, marten, wolf, moose, and several species of amphibians.  The area also provides habitat for marine mammals, including Steller sea lions, humpback and killer whales, porpoises, and otters, as well as migratory birds, including a large population of bald eagles.

31.     The area also provides an essential migratory corridor for all five species of Pacific salmon and is important habitat for other marine and forage fish.  The Lynn Canal area also supports other anadromous fish populations, including steelhead and cutthroat trout and Dolly Varden char as well as significant populations of shellfish, such as king, Tanner, and Dungeness crabs, clams, mussels, and shrimp.

32.     Every spring, eulachon gather in the tens of millions and make a spawning run in Berners Bay.  The run draws an abundant array of wildlife that come to the bay to feed on the eulachon.  Hundreds of Steller sea lions, harbor seals, bald eagles, and sea gulls, among other wildlife, have been observed descending on the bay in search of food during the eulachon run.

33.     The Lynn Canal and Berners Bay area contains spectacular scenery, and on bright, clear days, the views are unforgettable and unparalleled within the region.  The entire coastline of Lynn Canal is considered an area of high visual sensitivity.  The Alaska Marine Highway System route in this area is a designated Scenic Byway and has been identified as an "All-American Road" for its spectacular scenery and one-of-a-kind features.

34.     In the 1990 Tongass Timber Reform Act, Congress specifically designated 46,000 acres of Berners Bay as the Berners Bay Legislated LUD II area.  Pursuant to this Congressional designation, Berners Bay is to be managed "in a roadless state to retain [its] wildland character."  New road construction is generally prohibited in this area, except to allow vital forest transportation linkages and provide for transportation needs identified by the State of Alaska.

35.     Berners Bay and Lynn Canal are accessible easily from Juneau, Haines, and Skagway.  Residents use those areas extensively for recreational boating, including both kayaking and motorized vessels, fishing, hiking, camping, and wildlife viewing.  These areas are treasured in part because they are largely undisturbed, provide extensive wildlife viewing opportunities, and provide a sense of solitude.

36.     Construction and operation of the proposed road extension and ferry terminal would change this area dramatically.  The proposed road construction would necessitate clearing at least 428 acres of forest habitat, including 286 acres of old-growth.  FHWA and DOT estimate that the road project would affect more than 10,000 acres in the inventoried roadless area.

37.     The proposed project would alter the landscape and destroy the untouched nature of the area.  It also would increase access to the area and create a new and persistent source of noise.  Construction and operation of the highway would affect wildlife, including habitat for protected species, such as Steller sea lions and bald eagles.

<u>The Planning Process</u>

38.     Improving transportation to and from Juneau has been debated in Southeast Alaska for decades.  The issue has proven contentious, and a majority of residents in the three communities most affected by the proposed project, Juneau, Haines, and Skagway, do not support it.

39.     The most recent vote in Juneau showed that residents favor improved ferry service rather than road construction in Lynn Canal.  Residents in Skagway also have voted to support ferry service rather than road construction.  The cities of Haines and Skagway have passed resolutions supporting ferry service rather than road construction.

40.     In June 1997, DOT and FHWA issued a Draft Environmental Impact Statement for the Juneau Access Improvements Project (DEIS).

41.     The DEIS evaluated three alternatives.  In that document, Alternative 1 was called "No-Build/Transportation System Management."  Under that alternative, DOT would not construct new ferries, terminals, or roads but, instead, would continue to adjust ferry service to best accommodate Southeast Alaska.  In the DEIS, Alternative 2 proposed a highway link on the east side of Lynn Canal connecting Juneau all the way to Skagway.  DEIS Alternative 4 identified four "all-marine" options which proposed supplementing or replacing existing mainline ferry service with fast ferries that would operate either from the existing ferry terminal in Auke Bay or a new terminal at Sawmill Creek.

42.     In January 2000, Governor Knowles stopped further work on the project and EIS.

43.     Governor Murkowski took office in 2002.  He reinitiated work on the EIS. Construction of a highway around Berners Bay has been a priority for Governor Murkowski and his administration.

44.     In January 2005, DOT and FHWA issued a Supplemental Draft Environmental Impact Statement (SDEIS).  The SDEIS evaluated four variations of a highway on the east side of Lynn Canal, a west-side of Lynn Canal highway, and an alternative describing four "all-marine" options.  The four "all marine" options proposed construction of new mainline or fast vehicle ferries to operate from either Auke Bay or a new ferry terminal at Sawmill Creek.  Each of the alternatives, except the No Action Alternative, required construction of new roads, ferries, or terminals.  No alternative was evaluated in which existing ferry assets were managed more effectively to achieve the transportation goals identified for Lynn Canal without new construction.  Alternative 2, which required construction of a highway all the way along the east side of Lynn Canal to Skagway, was identified as the preferred alternative.

45.     In August 2005, DOT issued a press release stating that the preferred alternative had been changed.  That press release identified Alternative 2B as the preferred alternative. Alternative 2B requires construction of a highway on the east side of Lynn Canal to the Katzehin River delta.  A new ferry terminal would be constructed at the Katzehin delta, and travelers would board ferries there to reach Haines or Skagway.

46.     Options, including Alternative 2, involving construction of a road link all the way to Skagway were no longer deemed reasonable.  DOT and FHWA determined that construction of a highway into Skagway would use areas in or near the Klondike National Historical Park. Those lands are protected by Section 4(f) of the Department of Transportation Act, 49 U.S.C. § 303(c), which prohibits the use of those lands when a feasible and prudent alternative exists.

47. On January 18, 2006, DOT and FHWA issued the Final Environmental Impact Statement (FEIS). The FEIS evaluated four alternatives, including Alternative 2B. The No Action Alternative is a continuation of current ferry service in Lynn Canal as envisioned in the Southeast Alaska Transportation Plan. Alternative 3 requires construction of a highway on the west side of Lynn Canal. That alternative was deemed not reasonable in the 1997 DEIS. Alternative 4 describes "marine" options. Two variations of this alternative, 4B and 4D would extend the highway approximately 5 miles to Sawmill Creek and require construction of a new ferry terminal there. Under 4B, fast vehicle ferries would be built to connect to Haines and Skagway from Sawmill Creek; monohull ferries would be constructed to operate from the new terminal under version 4D. Under version 4A, two fast vehicle ferries would be constructed to operate from the existing ferry terminal at Auke Bay, and under 4C, two new monohull ferries would operate from the existing ferry terminal at Auke Bay.

48. Each action alternative evaluated in the FEIS requires construction of new roads, ferries, or terminals. The No Action Alternative reflects a continuation of current service. There is no alternative evaluated in the FEIS in which existing Alaska Marine Highway System assets are managed to optimize service in Lynn Canal without requiring construction of new roads, ferries, or terminals.

49. The plaintiff organizations submitted comments on the SDEIS and again on the FEIS requesting that DOT consider an alternative in which existing Alaska Marine Highway System assets are managed to optimize service in Lynn Canal without requiring construction of new roads, ferries, or terminals. DOT and FHWA refused to consider such an alternative on the grounds that such an alternative would come at the expense of reduced service elsewhere and would increase the cost of Lynn Canal service.

50.     Approximately 1,600 written or oral comments on the SDEIS were submitted to DOT.  Of those comments, only 26 expressed support for Alternative 2B.

51.     On April 3, 2006, FHWA Division Administrator David Miller signed a Record of Decision selecting Alternative 2B as the proposed action for the Juneau Access Improvements Project.

52.     FHWA has authorized the expenditure of federal funds on the Juneau Access Improvements Project.  In April 2006, FHWA authorized the expenditure of federal funds to complete the design and environmental study phase of the project and the appraisal and acquisition of the right-of-way.

53.     In May 2006, FHWA approved a project development authorization which authorized the expenditure of federal funds for construction of the first phase of the project.  The authorization allows DOT to spend federal money, once all permits are issued, to construct the first approximately 23 miles of the highway extension, including the road and bridges around Berners Bay.

54.     DOT has advertised a contract for construction of the road and bridges for the first approximately 23 miles of the highway extension.  DOT plans to open bids on that contract on August 31, 2006, if all permits are obtained by that date.  Within a short period of time after the bid opening, DOT plans to award the contract and allow actual construction to begin.

Old-Growth Habitat Areas

55.     The Tongass National Forest in Southeast Alaska is this country's largest National Forest and the largest remaining temperate rainforest ecosystem in the world.

56.     The National Forest Management Act (NFMA) requires the Forest Service to prepare and revise land and resource management plans for national forests. The current Tongass Land Management Plan (TLMP) was implemented in May 1997. It provides direction for management of the Tongass and guides all decisions regarding forest uses and resources. NFMA requires that any actions taken by the Forest Service which allow use or occupancy of the Tongass must be consistent with TLMP.

57.     The primary wildlife conservation strategy implemented by the Forest Service in TLMP is a system of reserves protecting a limited amount of old-growth habitat throughout the forest.

58.     TLMP assigns areas in the Tongass to a series of Land Use Designations. The plan identifies goals and objectives as well as management prescriptions for each designation. "Old-Growth Habitat" is one Land Use Designation to which land is allocated in TLMP.

59.     Old-Growth Habitat areas are to be managed to maintain and support important wildlife habitat as well as subsistence and recreation uses. The system of Old-Growth Habitat areas is intended to preserve the integrity of the old-growth ecosystem on the Tongass. Road construction in Old-Growth Habitat areas is inconsistent with this goal.

60.     TLMP also identifies a Land Use Designation called "Transportation and Utility System." The Forest Plan allocates no land area to that Land Use Designation. In addition, TLMP identifies several Transportation and Utility System corridors. These corridors overlay areas allocated to various Land Use Designations in TLMP. Prior to actual construction, the land underlying these corridors must be managed according to the goals and prescriptions of the underlying Land Use Designations.

61.    The proposed highway route crosses three designated Old-Growth Habitat areas. Construction of the road will result in the three Old-Growth Habitat areas no longer meeting the TLMP requirements.

62.    Under TLMP, the Forest Service may approve road construction through a designated Old-Growth Habitat area only if no feasible alternative exists.

63.    On May 4, 2006, FHWA submitted a letter to the Forest Service requesting a right-of-way through Tongass land for construction of Alternative 2B.

64.    On May 22, 2006, Forest Service Region 10 regional Forester Dennis Bschor approved the transfer of the requested lands to FHWA for purposes of constructing Alternative 2B. The approval allows FHWA to obtain a right-of-entry for construction.

65.    In deciding to approve the right-of-way, the Forest Service did not independently evaluate alternatives. The Forest Service has not concluded that no feasible alternative to the proposed road exists.

Steller Sea Lions

66.    The eastern stock of Steller sea lions, which includes most individual sea lions in Lynn Canal and Berners Bay, is listed as threatened under the ESA. Individual members of the western stock of Steller sea lions, which is listed as endangered, also have been found in the area.

67.    Critical habitat has been designated for the eastern stock of Steller sea lions. The designated critical habitat includes major haulouts and rookeries. There are two haulouts along the proposed highway route. One, Gran Point, has been designated critical habitat for Steller sea lions. The area of critical habitat around Gran Point includes all the land and water within a 3,000-foot radius of the haulout.

68. The proposed highway would pass directly through the designated critical habitat at Gran Point. The road also would pass within 300 feet of the haulout site itself.

69. Steller sea lions and their habitat may be affected by increased noise and human access that would result from construction, operation, and maintenance of the proposed highway.

70. Defendants are uncertain about the effects that noise caused by traffic, maintenance, or construction of the road project may have on Steller sea lions. Similarly, there is uncertainty about the effects of human activity in close proximity to sea lions.

71. The National Marine Fisheries Service (NMFS) has limited experience with the effects of construction noise on Steller sea lions and with the effects of human activity in close proximity to significant Steller sea lion haulouts. NMFS has stated that individual sea lions in the project area may be affected by construction, operation, or maintenance of the road in critical habitat.

72. Further, although the right-of-way for the road has been identified, specific construction plans for the portion of the highway through and adjacent to the designated critical habitat have not been developed or submitted to NMFS. NMFS cannot fully assess potential effects to Steller sea lions without reviewing more complete construction plans.

73. In light of this uncertainty, Defendants have agreed to a system of adaptive management for the critical habitat. This adaptive management plan allows for mitigation measures to change as Defendants determine which activities affect Steller sea lions.

74. The ESA requires an agency to initiate formal consultation with NFMS if its actions may affect a listed species or designated critical habitat. Formal consultation would result in the preparation of a Biological Opinion. DOT and FHWA did not initiate formal consultation. Instead, DOT and FHWA prepared a Biological Assessment in which the agencies

concluded that the project was not likely to cause jeopardy to the sea lion population or an adverse modification of the designated critical habitat.

75.     DOT and FHWA sought concurrence in the Biological Assessment from NMFS. NMFS determined that the mitigation measures proposed by DOT and FHWA might not be sufficient to prevent adverse effects to sea lions or their critical habitat. Accordingly, NMFS conditioned its concurrence in the determination that the project was not likely to affect Steller sea lions or their critical habitat on the acceptance of several additional mitigation measures.

76.     The additional mitigation measures broadened the monitoring program in order to confirm whether the mitigation measures successfully avoided effects to Steller sea lions.

77.     DOT and FHWA accepted the additional mitigation measures except one related to boat access. One of the additional mitigation measures required by NMFS was that no tideland permits for boat launches or other access points be granted. DOT did not have the authority to agree to this requirement. The Alaska Department of Natural Resources has authority to grant permits or easements for use of the tidelands in the state. The Department of Natural Resources refused to agree with this requirement.

78.     The mitigation measures included in the project allow DOT and FHWA to change procedures after construction of the project has begun. Final plans for construction in and near the critical habitat still must be approved by NMFS. Similarly, though the mitigation measures preclude construction within 3,000 feet of the Gran Point haulout when sea lions are present, the measures also allow NMFS to modify that restriction.

79.     NMFS may further modify the proposed mitigation measures after construction is completed near Met Point, the other haulout in the project area, and NMFS reviews the effects on sea lions from construction there.

80.     Several of the measures do not contain strict limits or prohibitions. Vibratory hammers will be used for pile driving "to the extent possible," and "as large a buffer as possible" of vegetation will be kept between the haulout and highway.

81.     The adaptive management scheme adopted by DOT, FHWA, and NMFS acknowledges uncertainty about the impacts to Steller sea lions and the effectiveness of the chosen mitigation measures. Those measures might prove ineffective, or circumstances may arise that would make the chosen mitigation measures impractical.

82.     For example, construction within 3,000 feet of Gran Point is prohibited when sea lions are present. The facts show that sea lions are present throughout the year except for a small number of days. Daily monitoring was conducted at Gran Point from December 2002 through September 2005. When the cameras were operational, sea lions were not observed at Gran Point only 58 days of the year during 2003. The longest continuous stretch of time during which no sea lions were present at Gran Point during 2003 was 12 days, from August 4 to August 15. When the cameras were operational, sea lions were not observed at Gran Point only 12 days of the year during 2004. The longest continuous stretch of time during which no sea lions were present at Gran Point during 2004 was 7 days, from August 7 to August 13. When the cameras were operational, sea lions were not observed at Gran Point only 51 days of the year from January 1 through September 30, 2005. The longest continuous stretch of time during which no sea lions were present at Gran Point during that period of observation was 21 days from July 30 to August 19.

83.     A further consideration that may result in modification of the mitigation measures is the presence of at least one bald eagle nest in the vicinity of the Gran Point haulout. For the proposed action, construction is prohibited within 330 feet of all bald eagles' nests between

March 1 and May 31. Blasting is prohibited within 0.5 miles of all nests during that same time. If a nest is active, no construction or blasting will occur within these distances until after August 31.

84.     On May 10, 2006, plaintiff organizations submitted a 60-day notice letter to FHWA. The letter stated that the failure to initiate formal consultation with regard to the designated critical habitat that may be adversely affected by this project violated the requirements of the ESA.

Bald Eagles

85.     Approximately 92 bald eagle nests are located within 0.5 miles of the proposed road alignment. Of those, approximately 49 nests are within 330 feet of the highway.

86.     Noise can alarm or otherwise upset bald eagles including disrupting the eagles' nesting behavior. Persistent noise can cause eagles to abandon their nests.

87.     Operation and maintenance of the completed road will result in a persistent source of noise. That noise will disturb bald eagles.

88.     As a result of the noise caused by operation or maintenance of the road, bald eagles may change nesting sites or abandon nesting territory altogether. The FEIS recognizes that eagles may abandon their nests as a result of increased noise due to maintenance and operation of the completed road. FHWA and DOT have not addressed this issue or provided a mechanism for remedying this potential effect.

89.     Neither FHWA nor DOT has obtained a permit or other approval from the United States Fish and Wildlife Service authorizing the taking or disturbance of bald eagles.

Traffic Demand

90.     The analysis of traffic demand under each alternative evaluated in the SDEIS is contained in the "Traffic Demand Forecast."  That document was prepared for DOT and FHWA by a contractor, and it is attached to the SDEIS as Appendix C.  The results of this analysis are used throughout the FEIS.  DOT and FHWA relied on the Traffic Demand Forecast in making the choice among alternatives.  The agencies also used the results to justify the choice of Alternative 2B as the proposed action.

91.     A simple model is used to predict current travel demand.  The model depends heavily on the calculation of a "frequency delay time" for each alternative.  The "frequency delay time" is a measure of how often a passenger can make a trip in Lynn Canal.  It is measured by assuming that travel occurs during a 16-hour window each day.  For each alternative, those 16 hours are divided by the average number of ferry trips per day.  The frequency delay time is equal to half of the interval between ferry trips.

92.     The frequency delay times for the No Action Alternative were 513 minutes (8.55 hours) to Haines and 529 minutes (8.82 hours) to Skagway.  FHWA and DOT, therefore, have assumed that, on average, people will wait more than 8 hours to take the ferry to Haines and Skagway under the No Action Alternative.  Because this number is an average, it also reflects an assumption that some travelers will wait twice that long.

93.     Similarly, the frequency delay times for options 4A and 4B were 182.9 minutes (3.05 hours) to both Haines and Skagway.  The frequency delay time for option 4C was estimated to be 371.4 minutes (6.19 hours) to both Haines and Skagway, and the frequency delay time for option 4D was 285.5 minutes (4.76 hours) to both Haines and Skagway.

94.    The frequency delay time is a very significant factor in the prediction of travel demand.  It is the single most important factor in predicting travel under the No Action Alternative and at least two of the "all marine" options.

95.    The EIS includes a calculation of net present value for each alternative.  This calculation is used to compare the costs and benefits of the alternatives.  When frequency delay time is included in this calculation, the highway alternatives have higher net present value than the ferry options and No Action Alternative.  The No Action Alternative ranks 7th in that comparison.  When frequency delay time is removed from the calculation, the No Action Alternative has the highest net present value and, therefore, becomes the first ranked alternative. A version of the "all marine" Alternative, option 4D, becomes the second highest-ranking choice.

96.    The FEIS and ROD assert that the lengthy frequency delay times are reasonable because they represent a measure of travel convenience.  Evidence was presented to FHWA and DOT with comments on both the SDEIS and FEIS showing that these long frequency delay times overstate the measure of convenience and do not accord with industry standards.  No contrary explanation or evidence was provided in the FEIS or ROD.


COUNT I

Failure to Comply with Tongass Land Management Plan

(National Forest Management Act)


97.    Plaintiffs repeat and incorporate by reference the allegations contained in the preceding paragraphs.

98. The National Forest Management Act (NFMA) requires the Forest Service to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System." 16 U.S.C. § 1604(a). All "[r]esource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands shall be consistent with the land management plans" required by the act. *Id.* § 1604(i).

99. The Tongass Land Management Plan allows road construction in designated Old-Growth Habitat only "if no feasible alternative is available." TLMP at 3-81.

100. The Forest Service granted a right-of-entry for road construction through designated Old-Growth Habitat without determining that no feasible alternative exists.

101. The Forest Service violated NFMA by allowing the use and occupancy of national forest land without following the requirements in TLMP.

COUNT II

<u>Bald Eagles</u>

<u>(Bald Eagle Protection Act, Administrative Procedure Act)</u>

102. Plaintiffs repeat and incorporate by reference the allegations contained in the preceding paragraphs.

103. The Bald Eagle Protection Act makes it unlawful to "take . . . any bald eagle" without a permit. 16 U.S.C. § 668(a). "Take" is defined broadly to include "pursue, shoot, shoot at, poison, wound, kill, capture, trap, collect, molest or disturb." 16 U.S.C. § 668c.

104. The FEIS acknowledges that operation of the completed highway may disturb eagles by causing them to abandon nesting sites.

105. FHWA acted arbitrarily in violation of the APA by approving the selection of Alternative 2B without ensuring compliance with the Bald Eagle Protection Act.

## COUNT III

### Failure to Consider Reasonable Alternatives

### (National Environmental Policy Act)

106.     Plaintiffs repeat and incorporate by reference the allegations contained in the preceding paragraphs.

107.     The National Environmental Policy Act (NEPA) requires federal agencies to prepare environmental impact statements on any proposal for "major Federal actions significantly affecting the quality of the human environment . . . ."  42 U.S.C. § 4332(C).

108.     An EIS must provide "detailed statement[s] on . . . alternatives to [its] proposed action[s]," 42 U.S.C. § 4332(C)(iii), and to "study, develop, and describe appropriate alternatives to [its] recommended courses of action."  42 U.S.C. § 4332(E).

109.     Moreover, an EIS shall "[r]igorously explore and objectively evaluate all reasonable alternatives" to the agency's proposal.  40 C.F.R. § 1502.14(a).  The existence of a reasonable, unexamined alternative renders an EIS deficient and violates NEPA.

110.     Department of Transporation regulations require that "[t]ransportation system management and investment strategies designed to make the most efficient use of existing transportation facilities" should be analyzed.  23 C.F.R. § 450.208(a)(10).

111.     FHWA refused to consider a reasonable alternative in which existing ferry assets are used more effectively and no new construction is required.  Such an alternative was considered earlier in the NEPA process, and the reasons given by FHWA for its failure to consider it in the supplemental draft and final EISs are arbitrary.

112.     Thus, FHWA violated NEPA by failing to consider a reasonable alternative.

COUNT IV

Misleading Traffic Demand Forecast

(Department of Transportation Act, Administrative Procedure Act,

National Environmental Policy Act)

113.    Plaintiffs repeat and incorporate by reference the allegations contained in the preceding paragraphs.

114.    Prior to authorizing the expenditure of federal funds, FHWA must review and approve plans and specifications submitted by a state transportation department. 23 U.S.C. § 106(a). Upon reviewing those plans, FHWA must ensure that the project will "adequately serve the existing and planned future traffic of the highway in a manner that is conducive to safety, durability, and economy of maintenance." 23 U.S.C. § 109(a). In making that decision, FHWA must "fully consider[]" "adverse economic, social, and environmental effects" in order to ensure that "the final decisions on the project are made in the best overall public interest . . . ." *Id.* § 109(h).

115.    In its consideration of those factors, comparison of alternatives, and decision to approve the project, FHWA relied on the results of the Traffic Demand Forecast.

116.    Evidence was presented to FHWA showing that the frequency delay times used in the SDEIS and FEIS were inaccurate and that they biased the Traffic Demand Forecast. The FEIS and ROD assert that the frequency delay times are a measure of convenience. The evidence in the record demonstrates that the frequency delay times used in the Traffic Demand Forecast overstate the measure of convenience and do not accord with industry standards. There is no contrary evidence presented in the FEIS, and FHWA has offered no other explanation for its use of the frequency delay times.

117.     FHWA acted arbitrarily in violation of the APA by approving the project based on an analysis using the frequency delay times without further explanation or evidence.

118.     Similarly, the presentation of inaccurate or misleading information in an EIS violates NEPA. "Agencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements." 40 C.F.R. § 1502.24. The preparing agency must "discuss at appropriate points in the final statement any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised." 40 C.F.R. § 1502.9(b); *see also id.* § 1503.4(a)(5) (obligating the agency, if it chooses not to modify its analysis, to "[e]xplain why the comments do not warrant further agency response, citing the sources, authorities, or reasons which support the agency's position and, if appropriate, indicate those circumstances which would trigger agency reappraisal or further response." 40 C.F.R. § 1503.4(a)(5).

119.     The evidence in the record shows that the frequency delay times used in the SDEIS and FEIS were inaccurate and that they biased the Traffic Demand Forecast. By relying on this inaccurate and misleading information without an adequate explanation for its use, FHWA violated NEPA.

COUNT V

Failure to Initiate Formal Consultation for Steller Sea Lions

(Endangered Species Act, Administrative Procedure Act)

120.     Plaintiffs repeat and incorporate by reference the allegations contained in the preceding paragraphs.

121.     The Endangered Species Act (ESA) requires all federal agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the

continued existence of any endangered species or threatened species or result in the destruction or adverse modification of" critical habitats. 16 U.S.C. § 1536(a)(2).

122.    If the agency determines that an action "may affect" a threatened species or designated habitat, it must initiate formal consultation with the National Marine Fisheries Service. 16 U.S.C. § 1536(a); 50 C.F.R. § 402.14(a).

123.    Despite the fact that the proposed road will cross designated critical habitat for Steller sea lions, FHWA did not initiate formal consultation. Instead, FHWA engaged in informal consultation with NMFS, which resulted in a Biological Assessment concluding that the proposed road is not likely to result in adverse modification of critical habitat.

124.    FHWA agreed to implement a series of mitigation measures. These mitigation measures allow for a system of adaptive management through which actual protections may change as FHWA and NMFS learn whether the identified measures are effective. This type of mitigation reflects significant uncertainty about the effectiveness of the chosen measures and the effects that construction, operation, and maintenance of the highway may have on Steller sea lions and their critical habitat.

125.    That uncertainty requires the initiation of formal consultation. FHWA acted arbitrarily in violation of the Endangered Species Act, 16 U.S.C. § 1536, and the Administrative Procedure Act, 5 U.S.C. §§ 702, 706, by failing to initiate formal consultation with regard to Steller sea lion critical habitat.

PRAYER FOR RELIEF

WHEREFORE, the plaintiffs respectfully request that the court:

1. Enter a declaratory judgment that:

a. the Forest Service violated NFMA by approving a right-of-way crossing designated Old-Growth Habitat without determining that no feasible alternative existed;

b. FHWA acted arbitrarily by approving the choice of Alternative 2B when its own findings show that operation of the completed road may result in the taking of bald eagles in violation of the Bald Eagle Protection Act;

c. the FEIS for the Juneau Access Improvements Project violates NEPA by failing to consider reasonable alternatives for improving transportation in Lynn Canal using existing infrastructure without new construction;

d. FHWA acted arbitrarily by approving the selection of Alternative 2B when evidence in the record shows that the frequency delay times used in the Traffic Demand Forecast were inappropriate, and FHWA did not adequately explain its decision to use those times;

e. FHWA violated NEPA by relying on inaccurate and misleading frequency delay times in predicting traffic demand and by failing to explain its use of those frequency delay times in light of evidence in the record showing that they were inaccurate; and

f. FHWA acted arbitrarily in violation of the Endangered Species Act and Administrative Procedure Act by failing to initiate formal consultation when the proposed road may adversely affect designated critical habitat for Steller sea lions;

2. Enter appropriate injunctive relief;

3. Award Plaintiffs the costs of this action, including reasonable attorneys' fees; and

4. Grant such other relief as this Court deems just and proper.

Dated this 16th day of August 2006.

Respectfully submitted,

s/ Michael C. LeVine

Michael C. LeVine (ABA# 0405032)
Katharine S. Glover (ABA# 0606033)
Eric P. Jorgensen (ABA# 8904010)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
Ph: 907-586-2751
Fax: 907-463-5891
Email: mlevine@earthjustice.org

*Attorneys for Plaintiffs*