

# J U N E A U
# A C C E S S

# FPE/Roen-Lochner Joint Venture

Mendenhall Mall ~~Annapp~~

P.O. Box 34797
Juneau, Alaska 99803
PH: (907) 790-3341   FAX: (907) 790-3342

## MEMORANDUM

**DATE:** December 21, 1995

**TO:** Bill Ballard
Regional Evironmental Coordinator
Southeastern Region
DOT/PF

**FROM:** Art Dunn   *A.D.*
Dunn Environmental

Rick Reed   *RR*
FPE/Roen Engineers

ALASKA DOT & PF
SOUTHEAST REGION

DEC 2 7 1995

ENVIRONMENTAL SECTION

**SUBJECT:** Steller sea lion Critical Habitat Area alignment issues

In order for design staff and management to better understand the complex issues surrounding alignment options  through the Steller Sea Lion Critical Habitat Area for the East Lynn Canal alternative, Rick Reed and I have prepared the following paper.

## AGENCY JURISDICTIONS

### National Marine Fisheries Service (NMFS)

The NMFS has jurisdiction over marine mammals protected under the Endangered Species Act (ESA).  The Steller Sea Lions are listed under the ESA as Threatened Species.  The NMFS has designated an area with a radius of 3,000 ft., centered on the sea lion haulout, as a Critical Habitat Area for the Steller sea lions.  Any activity within the Critical Habitat Area (in this case, the construction and operation of the East Lynn alternative) must comply with the ESA, and follow the process laid out in Section 7 of the ESA.

NMFS is concerned primarily with disturbance of the sea lions, both during construction activities, and for the long term, during operation of the alternative.  Elements of disturbance NMFS is concerned with include noise and vibration, habitat alteration, visual intrusion (ability of the sea lions to see project-related motion on the land), and intrusion by people that would scare the sea lions off the haulout.

In addition, NMFS would comment on any application to the Corps of Engineers for fill

**Declaration Exhibit 20, Page 1 of 5**

below high tide to construct the highway, or to dispose of waste rock.

## US Fish and Wildlife Service (F&WS)

Within the Critical Habitat Area are 3 known Bald eagle nests. The F&WS has jurisdiction over the nests and Bald eagles by way of the Bald Eagle Protection Act (BEPA). Although no permit would be issued by the F&WS for construction of the alternative in the vicinity of the nests, a direct taking of a nest tree by road construction, an indirect taking of a tree, such as from wind-throw attributable to roadway clearing, or the taking of a Bald eagle, such as from disturbance of nesting eagles leading to failure of eggs or death of immature eagles, would be a violation of the BEPA.

The established process of coordination with the F&WS to avoid violations of the BEPA involves agreement upon design and timing commitments that would reasonably avoid take of nests or eagles.

## US Army Corps of Engineers (COE)

The COE, as mentioned above, has jurisdiction over fills below high tide, as well as disposal of waste rock below high tide. Should a fill below high tide (approximately 21 ft el., MLLW datum) within the Critical Habitat Area be necessary, the COE would seek the expertise of the NMFS regarding impacts to the Steller sea lions.

## CONSTRUCTION AND OPERATIONS ISSUES

### Operations:

Elements of operation of the highway alignments likely to disturb both Sea lions and Bald eagles are: noise, visual disturbance (including threatening intrusion by humans or pets), and alteration of habitat. These elements should therefore be analysed for each alignment. The noise analysis should include such factors as snow removal and avalanche removal, if applicable.

The possibility of intrusion on the sea lion haulout may be minimized by design elements such as vertical rock walls on the downhill side of the road and no pulloffs in the vicinity.

At least a verbal agreement on the operational aspects of the alignments should be obtained from NMFS before proceeding to the construction impact analysis.

### Construction:

Very probably, the most chance of adversely impacting the Steller sea lions and Bald eagles within the critical habitat area would come during construction of the highway, as that is when by far the most activity would take place. Assuming three options for construction, an

2

alignment mostly within a rock cut, an alignment with one or more short tunnels as well as the rock cut, and a total tunnel (as presented in the location line by Lochner), the elements of construction most likely to cause disturbance to both sea lions and Bald eagles are: drilling and blasting, clearing and grubbing, and hauling and disposing of waste.

Investigation during the 1994 field season revealed that there is a period of time, roughly from mid July to early September, when the haulout receives little or no use by the sea lions. Although not agreed upon with the NMFS, this period of time may very well be the only time that construction activities that could disturb the sea lions on the haulout will be allowed to take place within the Critical Habitat area. Other activities, that would have little possibility of disturbance, may be allowed within the Critical Habitat Area while the sea lions are using the haulout.

Conversly, the usual windows for construction near Bald eagle nests to avoid disturbance of nesting activities is from mid to late August through mid March, assuming a nest is occupied. With roughly 50% of nests in Lynn Canal occupied in any year, it is more than reasonable to assume one or more of the three nests within the Critical Habitat Area would be occupied each summer.

Options for avoidance / mitigation:

The probable mutually exclusive construction windows force us to consider means to work outside of those windows that will be both acceptable to the resource agencies and reasonable in terms of design and cost.

Based on informal meetings with the NMFS, and knowledge of F&WS requirements, the full tunnel alignment would satisfy the resource agencies, given some consideration to disposal of waste rock. However, as the cost of construction and operation of that tunnel is more than the Department wishes to consider reasonable, other alignment options will need to be considered.

A suggested sequence for evaluation of construction phase mitigation and avoidance options for each of the remaining alignments is presented below. However, before proceeding with this analysis, it will be necessary to determine if the resource agencies would agree to the operational aspects of the alignments (discussed above in OPERATIONS). In addition, this analysis assumes issuance of a permit by NMFS to allow construction within the Critical Habitat Area during a construction window long enough, and for enough years, to reasonably construct the highway.

1. Model the nearest distance to the haulout and the Bald eagle nests that construction activities could be reasonably carried out without levels of noise, vibration, or motion that would cause disturbance. Sea lions' hearing is much like human's, and Bald eagle disturbance from construction activities is documented. These threshholds would need concurrence from the resource agencies.

3

Obviously, as the disturbance from each of the construction phase elements would be caused by noise and/or vibration, the distance of the activity from the haulout will be a major factor in the amount of disturbance generated. In addition, those activities visible from the haulout or eagle nests would probably be more likely to cause disturbance, the closer they are. Thus, two concepts for mitigation of construction impacts are known: the further away, the better; and the more alignment or activity out of sight, the better.

This exercise may, in effect, "shrink" the area within the Critical Habitat Area that construction activity is prohibited.

2. Estimate the cost to perform the remaining construction activities (those found in step 1 to be too close) within the construction windows. Estimates for completing construction in one, two, or more years should be done. Allowance should be made for having to wait for the nest behind the haulout (#549) to be unoccupied.

3. Perform steps 1 & 2 assuming that the Bald eagle nests could be rendered inoperable for a nesting season.

The results of this analysis may be sufficient grounds to convince the F&WS to allow placing cones on nest 549, or possibly on all of the three nests involved. The loss of those nests from the overall Bald eagle productivity of Lynn Canal for a season would probably be insignificant. However, this approach may be controversial, involve a lot of time, and there is no guarantee that it would finally be allowed by F&WS. In addition, with this approach the hazard exists that one or more pairs of eagles would construct a new nest within the area, with consequences impossible to forsee, but probably costly.

4. Compare costs of all options, and proceed into Section 7 consultation with the most efficient.

Monitoring of Bald eagles during nesting may extend construction windows and/or allow construction within recommended zones on a case by case basis, however it would be rash to assume any cost savings resulting from this exercise. Monitoring of sea lions on the haulout would probably be a required condition of any "Take" permit authorized by NMFS to work within the Critical Habitat Area. This monitoring could extend or shorten the construction window.

RECOMMENDATIONS AND CONCLUSIONS

The full tunnel alignment presented in the 1994 preliminary DEIS is the least likely to cause disturbance to the Steller's sea lion during construction and operation of the highway. This alignment may also be the only solution to the conflicting construction windows presented by the haulout and the Bald eagle nests.

If the tunnel alignment is to be rejected by the Department because of cost, then true costs of construction of the other alignments must be known in order to make the argument to allow

4

conventional construction within the Critical Habitat Area convincing. As noted above, these costs would include, but may not be limited to: costs to construct within the probable windows, costs to dispose of waste assuming that in-water disposal will not be allowed within the Critical Habitat Area, costs of any special construction techniques necessary to mitigate noise and vibration from construction, and maintenance costs such as avalanche clearing that would not be applicable with the tunnel alignment.

Rendering the Bald eagle nests inoperable for one or more seasons to allow for construction within the sea lion window should not be taken as a given. As noted above, this option is far from agreed upon, would probably be controversial, and may not be successful anyway.

Obtaining the necessary "Take" permit from NMFS to allow operation during the sea lion window is not a given. This permit could also be controversial, and if numbers of sea lions appeared during the window, the permit would undoubtedly contain a clause to stop construction.

cc: Tony Leonard, H.W. Lochner
    Ron Gebhart, FPE/Roen Engineers

5