RECEIVED
SEP 2 2 1995
H.W. LOCHNER, INC.

**Milton B. Barker, CCM**
Consultant
119 Seward Street, Suite 3
Juneau, Alaska 99801

Telephone 907-586-4301     Telecopy 907-586-1622

Tony Leonard
H. W. Lochner, Inc.
310 116th Avenue, S.E., Suite 550
Bellevue, Washington 98004

September 20, 1995

re: Review of Juneau Access Improvements Traffic Projection Analysis and User Benefit Analysis

Dear Tony:

As required by the Statement of Services in the Consultant Agreement between H. W. Lochner and myself, I have reviewed the Juneau Access Improvements Traffic Projection Analysis dated February 15, 1995, the User Benefit Analysis dated January 27, 1995, and further correspondence between ADOT and Lochner dated February 3, February 22, March 21, and April 10, 1995 concerning economic issues in the two analyses.

I also have reviewed letters to Tony Leonard from Jim Calvin dated June 23, 1995 and from Carla Sawyer dated July 31, 1995. I generally am in agreement with the points made in those letters. I have commented on points they raised only where my view differs or where I felt additional comments would be useful.

I have not reviewed independent literature that might bear on issues in these analyses. My comments do not address the methodology of project choice, which may include other elements or processes than these analyses.

Summary

The general approach taken in projecting traffic and user benefits was to decompose the analyses by users and links. Various methods, each appropriate to the job at hand, were used to estimate traffic and benefits at these micro levels. This appears to be a practical, and possibly the only, way to deal with a rather complex and unique set of options. The level of analysis seems appropriate for distinguishing economic aspects of the various options. Estimates appear to be fair and performed with a great deal of professional care.

I think that the major weaknesses in the analyses are:

1. the use of substantially different traffic growth rates for different alternatives, at least in the "most likely" case (item 17 under Traffic Projection Analysis);



2. traffic growth rates that may be on the high end of the scale (item 18 under Traffic Projection Analysis);

3. the lack of rationales or evidence supporting approaches used in estimating 2005 AADT, including elasticities (Demand Elasticities under Traffic Projection Analysis); and,

to a lesser extent:

4. not incorporating specific construction periods and cash flows for the alternatives (item 1 under User Benefit Analysis); and,

5. the possible understatement or overstatement of the value of user time by use of a cost approach, rather than a value approach (item 4 under User Benefit Analysis).

In the best of all worlds, a probabilistic approach to the user benefits and traffic analyses, as suggested by Jim Calvin in his letter of June 23, 1995, could be more informative. But, this would be an entirely different model. It would rely more on survey results or empirical data from analogous situations. Apparently, the absence of comparable situations is one of the reasons ad hoc methods had to be used in estimating demand in these analyses. A stochastic model would be far more costly and time-consuming, both in terms of doing the analytical work and making it intelligible to the reader.

My specific comments follow. The calculation errors I have identified are the result of spot checks to confirm the methodology. I generally have not checked all similar calculations.

Traffic Projection Analysis

**Demand Elasticities**

1. No specific support is given on page 5 for the use of 0.5% as the elasticity of demand (given a 1% change in average travel time and costs). Some corroboration for this level of demand response could be taken from the Long-Range AMHS Business Planning Analysis by Erickson & Associates, July 1993, which found the following elasticities based on 1987–1992 data:

| AMHS Traffic | Price (Fare) Elasticity | Service (Capacity) Elasticity |
|---|---|---|
| Southeast Passengers | -.56% | .59% |
| Southeast Vehicles | -.69% | .61% |

2

2. These AMHS elasticities are averages for all links in Southeast. It would be useful to have elasticities specifically for the JUNEAU–HAINES–SKAGWAY links segregated between visitor (for the Land Highway Visitor Traffic) and local/resident (for "Other" Recreation Traffic). The vehicle traffic data for these links is provided by origin-destination (O–D) on page 9. The O–D breakdown should be a rough approximation of the division between visitors and locals (JUNEAU–HAINES–SKAGWAY links vs. through traffic). AMHS's Annual Traffic Volume Report provides capacity by link. If AMHS revenue data were available by O–D, specific price and service elasticities for visitors and locals might be developed for these links.

   One problem that might arise would be the crowding out of local traffic by visitors during periods of peak demand. Elasticities might have to be developed by separate comparison of summer and winter travel. These elasticities might be refined if sufficient unaccomodated demand data is available from AMHS.

   Two possible shortcomings of data on unaccomodated demand might be:

   a. duplicate requests for travel from the same party if they have not been filtered out by AMHS; and,

   b. the lack of identification of which link is the bottleneck in unaccomodated requests for travel with an O–D outside JUNEAU–HAINES–SKAGWAY.

3. The elasticities in items 1 or 2 could be used for more than a confirmation of the 0.5% elasticity used in the Traffic Projection Analysis. They could be used as a rough way to estimate demand. Such estimates should provide a floor under the estimates contained in the Traffic Projection Analysis.

   Application of the service elasticities for either Southeast as a whole (item 1) or the specific links in question (item 2) could be applied to the changes in ferry capacity associated with the marine links for each alternative. This would produce estimated percentage changes in demand that could be applied to either total Existing AMHS demand or demand by specific user groups. Service elasticities from items 1 or 2 would not capture the effects of faster boats, or cars and their convenience, for that matter.

   The Traffic Projection Analysis does attempt to account for the additional demand stimulated by convenience, savings in travel time and cost, economic development effects, etc. The effects of savings in travel costs, and possibly time, might be approximated through use of price elasticities from items 1 or 2. But, as recognized in the Traffic Projection Analysis, use of elasticities cannot account for the effects of convenience, recreational opportunities, and economic development that figure prominently in the analysis.

3

Declaration Exhibit 27, Page 3 of 13
Case 1:06-cv-00009-JWS    Document 25-28    Filed 03/26/07    Page 3 of 13

2. These AMHS elasticities are averages for all links in Southeast. It would be useful to have elasticities specifically for the JUNEAU-HAINES-SKAGWAY links segregated between visitor (for the Land Highway Visitor Traffic) and local/resident (for "Other" Recreation Traffic). The vehicle traffic data for these links is provided by origin-destination (O-D) on page 9. The O-D breakdown should be a rough approximation of the division between visitors and locals (JUNEAU-HAINES-SKAGWAY links vs. through traffic). AMHS's Annual Traffic Volume Report provides capacity by link. If AMHS revenue data were available by O-D, specific price and service elasticities for visitors and locals might be developed for these links.

   One problem that might arise would be the crowding out of local traffic by visitors during periods of peak demand. Elasticities might have to be developed by separate comparison of summer and winter travel. These elasticities might be refined if sufficient unaccomodated demand data is available from AMHS.

   Two possible shortcomings of data on unaccomodated demand might be:

   a. duplicate requests for travel from the same party if they have not been filtered out by AMHS; and,

   b. the lack of identification of which link is the bottleneck in unaccomodated requests for travel with an O-D outside JUNEAU-HAINES-SKAGWAY.

3. The elasticities in items 1 or 2 could be used for more than a confirmation of the 0.5% elasticity used in the Traffic Projection Analysis. They could be used as a rough way to estimate demand. Such estimates should provide a floor under the estimates contained in the Traffic Projection Analysis.

   Application of the service elasticities for either Southeast as a whole (item 1) or the specific links in question (item 2) could be applied to the changes in ferry capacity associated with the marine links for each alternative. This would produce estimated percentage changes in demand that could be applied to either total Existing AMHS demand or demand by specific user groups. Service elasticities from items 1 or 2 would not capture the effects of faster boats, or cars and their convenience, for that matter.

   The Traffic Projection Analysis does attempt to account for the additional demand stimulated by convenience, savings in travel time and cost, economic development effects, etc. The effects of savings in travel costs, and possibly time, might be approximated through use of price elasticities from items 1 or 2. But, as recognized in the Traffic Projection Analysis, use of elasticities cannot account for the effects of convenience, recreational opportunities, and economic development that figure prominently in the analysis.

4. No explanation is given for the general approach to estimating demand in 2005. In some instances (Land Highway Visitor Traffic, "Other" Recreational Traffic), a variant on an explicit elasticity of demand is used. For other types of users, various ad hoc methods are used. This may be perfectly reasonable because the change in transporation modes, capacities, convenience, and costs is so great that elasticities derived from marginal changes in service and cost (e.g., the AMHS elasticities cited above) would be invalid. In fact, the upheaval in transportation options probably means a shift in the demand curve as well as movement along it. Some such rationale for the general approach would be helpful, as well as justification for certain specific aspects of the elasticity approach where it is used, i.e.:

   a. a rationale for using the average percentage change in travel time and travel costs in measuring elasticity in the discussion beginning on page 4. Travel time already is included in travel costs. The average approach weights travel time twice as much as travel costs.

   b. a rationale for using one-half the average percentage change in travel time and costs as the total demand for Land Highway Visitor Traffic, rather than the percentage change in demand. This may be more realistic as stated on page 15. More specific support for this approach would be desirable.

### Demand in 2005

5. Table 1 in the Executive Summary needs to be redone to show West Lynn Stage 1 and East Lynn Stage 1 traffic at the same level as the Improved AMHS, as stated in the footnote.

6. There appear to be three possible problems with the estimated increases in AADT for Land Highway Traffic on page 15:

   a. The calculated increases appear to double-count the growth in traffic from 1993 to 2005. For example, the analysis calculates the incremental demand for the Improved AMHS alternative as:

           225 AADT of Land Highway Traffic in 2005 x 25%
             (the % of Land Highway Traffic visiting Juneau in 2005)

   minus  145 AADT of Land Highway Traffic in 1993 x 20%
             (the % of Land Highway Traffic visiting Juneau in 1993).

4

Declaration Exhibit 27, Page 5 of 13
Case 1:06-cv-00009-JWS    Document 25-28    Filed 03/26/07    Page 5 of 13

However, the Land Highway Traffic visiting Juneau in 2005 under the Existing AMHS would be 225 AADT x 20%. This includes the growth in ferry traffic under the Existing AMHS, but no change in the percentage of visitors traveling to Juneau. Conceptually, this visitor traffic to Juneau in 2005 under the Existing AMHS is already counted as part of the 125 AADT contained in Existing Ferry Traffic Demand in Tables 5–8.[1] Thus, the incremental traffic for the Improved AMHS would be 225 AADT x the 5% increase in the percent of Land Highway Traffic visiting Juneau (25% - 20%).

b. The incremental traffic calculated on page 15 does not reconcile with the methodology that was used, apparently due to some other revisions to the analysis that were not carried through to this calculation.

c. I calculate the reduction in travel time for the Improved AMHS as 70%, not 60%.

Also, the Land Highway Traffic shown in Tables 5–8 is increased above the amounts on page 15 on the assumption that some portion of this traffic makes a return trip from Juneau to the Haines or Skagway road connection, rather continuing south on AMHS. It might be more straightforward and easier for a reader to follow if the 225 AADT for Existing AMHS were increased by the same percentage. The end result should not differ and the amount calculated on page 15 should then reconcile more readily with the amounts shown in Tables 5–8.

7. The AMHS Traffic estimated on page 15 appears to double-count this AMHS traffic from the south. The Existing Ferry Traffic Demand shown in Tables 5–8 is based on the link volumes shown at the top of page 11 (e.g., JUNEAU–HAINES 110 AADT) augmented by unaccomodated and unattempted demand (page 12). The AADT link volumes on page 11 are derived from Table 3 (page 10) by escalating 1992 traffic figures to 2005. The 1992 amounts in Table 3 are sums of amounts in Table 2 that include traffic from the south.

What appears to be needed here is some estimate of the incremental traffic from the South, given an alternative to Existing AMHS travel. For traffic originating south of Juneau, the percentage savings in travel time and costs will be a fraction of that for local travelers or Land Highway visitors who are making a decision based on marginal costs. For those traveling from the lower 48, the better alternatives might make no difference at all. The savings could make a difference though for travelers departing from Southeast Alaska south of Juneau. These Southeast travelers may be fairly small in number. A conservative guess would be to ignore any incremental AMHS Traffic from the south. An optimistic guess might be to apply the 0.5 elasticity to half the average savings on the links for the 34,000 visitors there would otherwise be in 2005. I guess that makes somewhere in between the best guess.

---

[1] The 125 AADT contained in Existing Ferry Traffic Demand in Tables 5–8 includes respectively 2.0% and 4.5% annual growth in overall ferry traffic on the JUNEAU–HAINES and HAINES–SKAGWAY links from 1992 to 2005. The 225 AADT of Land Highway Traffic in 2005 includes annual growth at 6.0% from 1993 to 2000 and 3.0% on to 2005.

5

8. The 5% of cruise ship visitors to Juneau that would motor out of SE Alaska (page 16) would only be traveling one-way, unlike the 5% of cruise ship visitors going on bus tours who are presumed to make a round-trip. This would slightly reduce the estimated AADT.

9. For projecting regional-based (local/resident) AMHS vehicle traffic on page 18, a 1990–1992 growth rate is used. To remain consistent with the total projections of AMHS traffic, a 1987–1992 growth rate, as used on page 10, would be better. The difference probably would be minor.

10. For "Other" Recreational Traffic, the reduction in travel time shown on page 20 for the Improved AMHS alternative appears to be 70%, not 60%, as mentioned in item 6.c above. This would slightly increase the estimated AADT's.

11. The 30% increase in "Other" Recreational Traffic for the West Lynn Stage 2 and East Lynn Stage 2 alternatives calculated on page 20 would equal 16 AADT and 13 AADT respectively, rather than the 15 AADT and 12 AADT shown.

12. The methodology for estimating Local/Resident Traffic (page 21) seems to be:

    ((households x trips/year x 2 directions of travel) ÷ 365 days/year) ÷ 2.5 ppv

    This seems conservative in that more than one person per household is likely to travel for at least some of the purposes included under this heading, e.g., shopping. Population could be substituted for households, division by 2.5 ppv could be omitted, or some partial adjustment could be made to the equation.

13. Local/Resident Traffic estimates are based on a survey mentioned on page 21. Presumably, the question eliciting the number of times persons would use improved facilities referred only to travel for non-recreational purposes, since recreational traffic is calculated separately. The projections also presume that the travel is the increased amount of travel, since Existing AMHS travel is projected separately. The text should make this clear.

14. Growth rates, which appear to refer to air cargo, on page 24 apparently were used to escalate current barge cargo traffic to 2005. If so, an historical trend for barge traffic might be used instead. However, the difference in AADT is likely to be slight.

15. The total AADT for the JUNEAU–KATZEHIN RIVER in Table 8 (page 29) is 688, rather than the 658 shown.

16. Tables 6–8 (pages 27–29) should be labeled West Lynn Canal Stage 2, East Lynn Canal Stage 2, and East Lynn Canal Stage 3 respectively to keep the Stage labels consistent with their use elsewhere in the analysis.

6

### Demand Growth to 2025

17. It is not clear that the growth rates developed in Chapter 4 (beginning on page 30) should differ among the alternatives, at least for the "most likely" scenario. Conceptually, the growth rates represent growth in exogenous variables—local populations and visitors. Local populations and outside visitors seem unlikely to be much affected in the long run by what local transportation alternative exists. Rather, they are more likely to be affected by economic variables such as local employment— in the case of local populations, and personal income, gas prices, and leisure time—in the case of visitors. Transportation infrastructure can stimulate economic development and job creation. But, the analysis has attempted to factor the foreseeable economic development into the baseline 2005 traffic figures.

The growth rates used seem to mix the effects of secular population and visitor growth with the effects of the different elasticities of demand for the various alternatives. The demand estimates of AADT for 2005 attempt to capture all the differences in travel time and cost, recreational opportunities, and at least some development opportunities (mining and logging). Varying the growth rates could double-count the relative attractiveness of the various alternatives. The descriptions on page 33 of the reasons for varying the growth rates from 2% to 3.5% reiterate most of the factors (travel time and cost, recreational opportunities, etc.) analyzed in Chapters 2 and 3 to produce the variations in demand for 2005.

The 1.5% spread in growth rates (from 2% to 3.5%) for the "most likely" cases means the demand for the alternatives with the lowest and highest traffic would diverge by an extra 35% after 20 years, and 110% after 50 years. Just positing the same growth rate starting from different levels of demand in 2005 will cause a significant further divergence in demand, e.g., from a difference of 420 AADT in 2005 for Improved AMHS compared to East Lynn 3 to 624 AADT in 2025.

7



| Year | Improved AMHS @ 2.0% | East Lynn 3 @ 2.0% | East Lynn 3 @ 3.5% |
|---|---|---|---|
| 2005 | 240 | 660 | 660 |
| 2006 | 245 | 673 | 683 |
| 2007 | 250 | 687 | 707 |
| 2008 | 255 | 700 | 732 |
| 2009 | 260 | 714 | 757 |
| 2010 | 265 | 729 | 784 |
| 2011 | 270 | 743 | 811 |
| 2012 | 276 | 758 | 840 |
| 2013 | 281 | 773 | 869 |
| 2014 | 287 | 789 | 900 |
| 2015 | 293 | 805 | 931 |
| 2016 | 299 | 821 | 964 |
| 2017 | 304 | 837 | 997 |
| 2018 | 310 | 854 | 1032 |
| 2019 | 317 | 871 | 1068 |
| 2020 | 323 | 888 | 1106 |
| 2021 | 329 | 906 | 1144 |
| 2022 | 336 | 924 | 1184 |
| 2023 | 343 | 943 | 1226 |
| 2024 | 350 | 961 | 1269 |
| 2025 | 357 | 981 | 1313 |

Some divergence might be reasonable given the inability to estimate the elasticities (demand in 2005) with great precision. But, a 1.5% difference in growth rates over a long period of time seems high. It would be slightly less than Juneau's total annual growth rate of 1.77% so far in the nineties. Greater congestion on alternatives with higher long-term growth could cause demand to converge. Travel times and costs as forecast in this analysis should not cause different growth rates. Travel times and costs are generally constant over the 20 year analysis period (with the exception of the AMHS alternative where vessel additions are staged).

The main basis, it would seem, for diverging growth rates would be commercial or industrial development above and beyond that modeled for the 2005 estimates. The easiest way to imagine the assumed divergence would be the discovery and development of a major mineral deposit along a road alternative. This may very well occur, but it would be entirely speculative at this point. Thus, for the high scenario, there could be an argument for higher growth rates for the hard links. The higher growth would represent the greater upside potential of these alternatives.

One way to deal with this question of diverging growth rates would be a sensitivity analysis for the "most likely" case that used the same growth rate for all alternatives.

18. 3.5%, rather than 4.5% might represent the upper end of possible traffic growth over a long period of time. 4.5% compounded over 20 years would increase traffic 140%. Over 50 years, it would increase it 800%.

8

Juneau's population grew annually 3.1% on average from 1980 to 1990, a decade that included a petrodollar-fueled boom. 1990 was the bottom of the trough following the bust in population that began in 1986. Since 1990, Juneau has grown at an annual rate of 1.77%.

A 3.5% rate might possibly be achieved over a long period of time with the additional stimulus of transportation improvements. However, this may be on the high end of possible growth rates. It would be about twice as fast as growth so far in the nineties.

Also, the discussion on pages 30 and 31 of long run growth rates of 2% for Juneau, 1%–2% for Haines and Skagway, and 2.5%–3.5% for vehicle visitor suggests that 3.5% as an overall growth rate may represent more of a high, than a middle case. The 5.75% growth from 1980 to the peak of the construction boom in 1985 is well beyond a sustainable growth rate.

## JUNEAU POPULATION

| Year | Population |
|---|---|
| 1980 | 19,528 |
| 1981 | 21,329 |
| 1982 | 22,451 |
| 1983 | 24,007 |
| 1984 | 25,268 |
| 1985 | 26,037 |
| 1986 | 25,998 |
| 1987 | 24,966 |
| 1988 | 24,655 |
| 1989 | 25,100 |
| 1990 | 26,751 |
| 1991 | 27,647 |
| 1992 | 28,621 |
| 1993 | 28,361 |
| 1994 | 28,519 |
| 1995 | 29,228 |

Source: Population figures are July 1 estimates of the Alaska Department of Labor, except for the 1980 and 1990 numbers which are April 1 census figures.

19. Figures 4–7, pages 36–39 appear to depict low and high growth rates of 1.5% and 4.0% for all alternatives, and are labeled as such. The text on pages 32 and 36 states that low growth rates vary from 1% to 1.5% and that high rates range from 4% to 4.5%.

9

## User Benefit Analysis

### Analytical Issues

1. The present value analysis assumes there would be no difference in how soon service would begin for the different alternatives. It also ignores differences in construction cash flows by assuming all construction expenditures occur in year 0 for all alternatives (except for the AMHS alternative where vessel acquisition is staged). Projects of this scale normally would take account of these differences in the present value analysis. The period of analysis would have to be lengthened to include the longest construction period as well as the design year period.

    The discussion on page 5 implies that all alternatives would have the same construction periods if funding is no object. Is this realistic? Even if it is, the construction cash flows are likely to be substantially different in their timing. Given the project scale, these differences in cash flows in the early years might be worth addressing.

    The most natural way to account for these factors would be to choose as the base year, the year of decision as to which alternative will be constructed, and lay out cash flows from that point on. This would account for different construction periods, construction cash flow patterns if desired, and dates of inauguration of service.

    Stating present values as of the year of a decision also would make for better judgments about the value of a project relative to funding available at that time or the value of other projects. Not discounting back to the year of decision would overstate the net present value relative to available funds or other projects. However, rankings or benefit/cost ratios of alternatives within a project would be the same under either approach.

    The existing analysis appears to place the base year somewhere beyond the year of decision and in the midst of design or construction. If one still wanted to take account of different construction periods and cash flows, cash flows occuring before the base year would have to be escalated from the year of expenditure to the base year at the 4.9% discount rate, while those occuring after the base year would be discounted to the base year at 4.9%.

2. If there are significant revisions to AMHS traffic projections, careful analysis would require re-evaluation of the number, type, sizing, and scheduling of AMHS vessels. The effort involved might recommend that this be done as part of the final, rather than the draft, EIS.

10

3. The concept of Juneau access probably dictates that accomodating peak demand be a strategic decision factor in this case. Accordingly, the number, type, size, and scheduling of AMHS vessels have been selected to accomodate peak demand (page 4). It might be worth noting that this may not achieve optimal net present values or benefit/cost ratios for AMHS alternatives. AMHS costs are largely fixed for a given vessel and routing. AMHS revenues, in contrast, are a function of load factors (traffic relative to capacity). Accomodating peak demand may mean smaller average load factors over the year because of significant excess capacity in the off-peak season. This would mean less annual revenues in relation to costs.

Although it is not stated, I am guessing that a similar policy call has probably been made at some point regarding the class of road to be constructed. If so, the strategic concern may have been minimizing user costs in terms of travel time, accidents, and vehicle wear and tear, rather than capacity limitations. This decision might also generate alternatives that would not necessarily maximize net present values or benefit/cost ratios. Again, this might be worth noting, if true.

4. The methods used to value user time (page 24) may be an adequate approximation. In theory, the value of user time should be based on value, not cost savings in wages. For commercial activities, it might be possible to develop a measure of worker productivity in the trucking industry. Yet, even this would not measure the value to the shipper. Valuation of time for recreational travel would be more complex. Economic literature may contain an approach that would be feasible. Given the large proportion of total traffic that is made up of recreational travel, exploration of alternative ways to value such time could be worthwhile.

A more refined analysis of user time also could adjust time values based on projected changes in real incomes during the course of the study period.

5. The frequency delay as described on page 25 might be of minimal applicability for local/resident travel (traffic originating in Juneau, Haines, or Skagway). Presumably, such travelers would time their departures to meet the ferry schedules. Frequency delay may only be of significance for the Land Highway Visitor Traffic.[2]

I noted that the frequency delay tables in the appendix are in terms of hours, not half-hour intervals as stated on page 25.

6. Average accident costs on page 30 were developed in part by using injury costs per person by types of injury (or lack of), weighted by accidents by type of injury involved. It is unclear if the number of persons injured in each accident is included in the weightings.

---

[2] Work subsequent to the January 27, 1995 version of the User Benefit Analysis eliminated frequency delay for AMHS traffic from the south.

11

I also note that the National Safety Council recommends using significantly higher "comprehensive costs of motor-vehicle accidents" in cost/benefit analyses. Comprehensive costs include "a measure of the value of lost quality of life which was obtained through empirical studies of what people actually pay to reduce their safety and health risks".

**Items to be Edited**

7. The capital costs for the West Lynn 2 and East Lynn 3 quoted on page 5 do not match those contained in the table in the Executive Summary or the present value analysis spreadsheets.

8. The next to last paragraph on page 17 identifies the capital costs in Table 5 as being in year 2000 dollars, while the Table states 1994 dollars.

9. I noted a misstatement of the sample Vehicle Fare on page 38 as $45, when it should be $24.

10. The analysis would be more comprehensible if traffic, user cost, and elements of the net present value analysis (e.g., number of users and benefits) were consistently disaggregated in terms of links or O-D pairs. For example, Table 12 presents unit user costs by O-D pairs, the first table in the appendix presents traffic volumes by links, and the net present value tables in the appendix presents data by O-D pairs by links. The current draft would require a reader to wade through the fratared trip tables in the appendix to actually follow the analysis. The draft provides only a brief reference on page 34 to the fratared tables. It does not call attention to the need for the translation contained in the fratared tables or explain it in any way. Depending on how all this is handled, the fratared tables themselves might be summarized in a manner that produced the totals shown in the net present value analysis or elsewhere.

   A final note is that the fratared tables for the East Lynn alternatives apparently were inadvertently included. This is confusing because they were not used in deriving the number of users for the net present value analysis. It might be worthwhile to illustrate, perhaps in an appendix table, how the East Lynn numbers of users were derived.

Sincerely,

*Milton B. Barker*

Milton B. Barker