Katharine S. Glover
Eric P. Jorgensen
EARTHJUSTICE
325 Fourth Street
Juneau, Alaska 99801
Ph: 907-586-2751
Fax: 907-463-5891
Email: kglover@earthjustice.org

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| SOUTHEAST ALASKA CONSERVATION COUNCIL, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| FEDERAL HIGHWAY ADMINISTRATION, *et al.*, | ) ) | Case No. 1:06-cv-00009-JWS |
| Defendants, | ) ) | |
| and | ) | |
| STATE OF ALASKA, | ) ) | |
| Intervenor-Defendant. | ) ) | |

**PLAINTIFFS' REPLY BRIEF**

# TABLE OF CONTENTS

I       FEDERAL HIGHWAY ADMINISTRATION FAILED TO CONSIDER A
        REASONABLE ALTRNATIVE MAKING BETTER USE OF EXISTING
        ASSETS. ...............................................................................................................1

        A.    The Agencies' Justifications For Not Considering Improved Ferry
              Service With Existing Assets Are Arbitrary..........................................................3

        B.    The Final EIS Does Not Consider Improved Ferry Service Using
              Existing Assets........................................................................................................4

II.     FREQUENCY DELAY IS IMPORTANT TO THE AGENCIES
        ANALYSIS OF ALTERNATIVES AND PRESENTS A MISLEADING
        ANALYSIS TO THE PUBLIC. ..................................................................................6

        A.    The Federal Highway Administration Failed to Disclose a Significant
              Problem....................................................................................................................7

        B.    Frequency Delay is an Important Factor in the Agencies' Comparison
              of Alternatives. ......................................................................................................8

        C.    Experts Repeatedly Criticized Frequency Delay as Overstated. ......................9

        D.    The Changes in the Frequency Delay Model Do Not Address the
              Flaws.......................................................................................................................10

III.    THE FEDERAL HIGHWAY ADMINISTRATION VIOLATED THE
        ADMINISTRTATIVE PROCEDURES ACT BY APPROVING A ROAD
        THAT MAY VIOLATE THE BALD AND GOLDEN EAGLE
        PROTECTION ACT.................................................................................................11

IV.     THE FOREST SERVICE'S APPROVAL OF A RIGHT-OF-WAY
        THROUGH OLD-GROWTH HABITAT VIOLATES THE NATIONAL
        FOREST MANAGEMENT ACT...............................................................................15

V.      THE FEDERAL HIGHWAY ADMINISTRATION FAILED TO INITIATE
        FORMAL CONSULTATION AS REQUIRED UNDER THE
        ENDANGERED SPECIES ACT................................................................................20

VI.     AN INJUNCTION IS NECESSARY TO PREVENT IRREPARABLE
        HARM........................................................................................................................25

CONCLUSION.......................................................................................................................25

Plaintiffs submit this Reply in support of their Opening Brief (Doc. No. 67, filed March 6, 2008) and in response to Defendants' Brief (Doc. No. 81, filed May 20, 2008) and Intervenor-Defendants' Brief (Doc. No. 85, filed May 30, 2008).[1]

I.      THE FEDERAL HIGHWAY ADMINISTRATION FAILED TO CONSIDER A REASONABLE ALTRNATIVE MAKING BETTER USE OF EXISTING ASSETS.

In the Final EIS and Record of Decision for the Juneau Access Project, the Federal Highway Administration refused to consider an alternative improving ferry service with existing assets.  The agency specifically stated that any such alternative would result in decreased ferry service elsewhere in the system or increased costs.  *See* Ex. 46 at 37 (stating that transportation system management, which "maximize[s] the efficiency of an existing system with little or no new construction" was not included in the EIS because it "would be at the expense of service elsewhere"); *see also* Ex. 91 at 2; Ex. 52 at 41.  Plaintiffs demonstrated in their Opening Brief that those justifications apply to every alternative considered, in particular to the selected alternative, and are therefore an arbitrary basis on which to exclude improved ferry service alternatives.  *See* Pls.' Op. Br. at 19-21.  Neither Federal-Defendants nor the State address this argument.  Instead, they now argue, in direct contradiction to the agencies' statements in the Final EIS and the Record of Decision, that the Final EIS did consider improvements to ferry service using existing assets or a substantially similar alternative.  *See* Fed.-Defs.' Br. at 17-18; State's Br. at 7-9.  The record shows, however, that no such alternative was considered.

The Defendants first argue, however, that an improved ferry service alternative did not need to be considered because Plaintiffs delayed in proposing that alternative.  Plaintiffs did not delay; rather, they participated throughout the process and raised this issue exhaustively.  The National Environmental Policy Act requires that parties challenging an action must "structure their participation so that it is meaningful, so that it alerts the agency to [their] position and contentions."  *Morongo Band of Mission Indians v. Fed. Aviation Admin.*, 161 F.3d 569, 576 (9th Cir. 1998).  Although a plaintiff challenging an agency's consideration of alternatives must offer a proposal with "a chance of success," *id.*, the agency has the "primary responsibility to ensure that it complies with [the National Environmental Policy Act]."  *'Ilio 'Ulaokalani Coal. v.*

---

[1] Citations to briefs of Defendants and Plaintiffs indicate the page numbers shown on the ECF headers.  Citations to exhibits, as in Plaintiffs' Opening Brief, indicate the exhibit page numbers.

*Rumsfeld*, 464 F.3d 1083, 1092 (9th Cir. 2006). In their Supplemental Draft EIS comments, the Southeast Alaska Conservation Council (SEACC) and the Alaska Transportation Priorities Project argued that the transportation agencies should consider ferry alternatives that "improv[e] service without expenditure of significant capital funds" through use of existing boats and changes in management, operations, and ferry funding. Ex. 94 at 7; *id.* at 8 (criticizing Alternatives 4A-4D because they require significant expenses for new construction). SEACC also suggested that simple schedule changes, such as running an existing boat, the *M/V Fairweather*, in a loop in Lynn Canal could improve service without new construction. *Id.* at 8-9; *see also* Ex. 93 at 6 (Lynn Canal Conservation comments on the Supplemental Draft EIS); Ex. 88 at 3 (Lynn Canal Conservation Draft EIS comments). Plaintiffs continued to participate in the process and submitted comments on the Final EIS to fully raise issues before decision-makers and offered a further example of the type of alternative that should have been considered. *See* Ex. 50 at 9-17, 9-61. But Plaintiffs' argument is not that the Federal Highway Administration should have considered only the exact alternative raised by SEACC in its comments on the Final EIS, rather it is that the agency should have considered this type of alternative as urged by SEACC throughout the process.

In addition, the National Environmental Policy Act does not require that Plaintiffs themselves raise an issue, particularly where the agency was clearly aware of it. *See Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 971 (9th Cir. 2006) ("[T]here is no 'broad rule which would require participation in agency proceedings as a condition precedent to seeking judicial review of an agency decision.'"); *'Ilio 'Ulaokalani Coal.*, 464 F.3d at 1092 (where there is evidence that the agency was aware of the alternative, litigants need not have raised it). Here, agency officials specifically recognized that this would be the "first obvious alternative" the agencies should consider. *See* Ex. 6 at 1; *see also* Ex. 22 at 4 (Erickson report noting changes in fares, policies, or redeployment are not considered); Ex. 4 at 5-6 ("Remanaging the [ferry system] is the achilles tendon to the project."); Ex. 16 at 9-10 (1997 EPA comments stating that the EIS should discuss whether the current ferry operations are at the most efficient level.). In addition, during consideration of the Supplemental Draft EIS, many members of the public asked the Federal Highway Administration to consider improvements to the existing ferry system. *See, e.g.*, Ex. 92 at 6 ("[W]e feel that improved marine access in the form of existing mainline ferries is the most environmentally sane option for Lynn Canal."); *see also, e.g.*, Ex. 92 at 2; Ex.

2

92 at 4; Ex. 92 at 7; Ex. 93 at 1; Ex. 93 at 3-4.  Plaintiffs, agency officials, and other members of the public raised this alternative repeatedly and the Federal Highway Administration's refusal to consider it was arbitrary.

      A.      <u>The Agencies' Justifications For Not Considering Improved Ferry Service With Existing Assets Are Arbitrary.</u>

Federal-Defendants and the State repeat that improved ferry service with existing assets would decrease service elsewhere and increase costs, but do not address Plaintiffs' argument that these justifications are arbitrary.  *See* State's Br. at 4-12; Fed.-Defs.' Br. at 19; Pls.' Br. at 19-21.  Those justifications, and the agencies' refusal to consider improved ferry service with existing assets, are arbitrary because the justifications apply to, but did not prevent consideration, of every other alternative the agencies did include.  *See 'Ilio 'Ulaokalani Coal.*, 464 F.3d at 1099-1101.  Eliminating Lynn Canal ferry service with the construction of a road, and the resulting loss of revenue from those lucrative ferry runs, would force the agencies to choose between increasing subsidies for the ferry system or decreasing service elsewhere to reduce costs.  *See* Pls.' Op. Br. at 20-21.  Defendants apparently do not contest this, and the record supports it.  Therefore, the Federal Highway Administration's justifications for failing to consider an alternative making better use of existing boats and terminals are arbitrary and violate the National Environmental Policy Act.

The State also argues that an alternative making better use of existing assets may not meet the purpose and need for the project.  *See* State's Br. at 11-12.  The Federal Highway Administration did not rely on this justification in the Final EIS or in the Record of Decision, and the Court should not consider it.  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 50 (1983) ("[C]ourts may not accept . . . counsel's post hoc rationalizations for agency action. . . . It is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself.").  Nonetheless, the primary basis of this argument is that any such alternative would increase costs or reduce service elsewhere.  *See* State's Br. at 11-12.  This simply repeats the arbitrary justifications discussed above.  In addition, the State argues that the specific alternative SEACC suggested in its Final EIS comments would not have sufficient capacity to meet the predicted unconstrained demand for travel in Lynn Canal.  But, as the State illustrates in its brief, capacity for the alternative suggested by SEACC would fall well within the range of the other alternatives considered.  *See* State's Br. at 9.  Moreover, neither the State nor

Federal-Defendants have demonstrated why adjusting schedules, increasing the frequency of ferry service, reducing fares, or other improvements using existing boats and terminals could not meet the purpose and need for the project. Plaintiffs need only offer an alternative with a "chance of success" in order to show that the Federal Highway Administration has failed to consider a reasonable range of alternatives. *See Morongo Band of Mission Indians*, 161 F.3d at 576; *see also Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 235 F. Supp. 2d 1143, 1154-55 (W.D. Wash. 2002) (stating that an agency cannot reject an alternative simply because it does not provide a complete solution to the problem). Plaintiffs have done so, and Defendants have offered only arbitrary justifications for their refusal to consider this obvious alternative. *See Oceana Inc. v. Evans*, 384 F. Supp. 2d 203, 241 (D.D.C. 2005) (an agency's failure to consider an "obvious alternative" has lead uniformly to reversal); *Cal. v. Block*, 690 F.2d 753, 769 (9th Cir. 1982) (exclusion of obvious alternative was unreasonable); *Coal. For Canyon Preservation v. Bowers*, 632 F.2d 774, 784 (9th Cir. 1980) (EIS was inadequate for failure to discuss reasonable and obvious alternative).

  B.  <u>The Final EIS Does Not Consider Improved Ferry Service Using Existing Assets.</u>

  Defendants now argue, despite the transportation agencies' explicit refusal to consider improved ferry service with existing assets, that in fact the No Action Alternative considered "existing ferry service as it will be modified or upgraded over time." State's Br. at 7; *see also* Fed.-Defs.' Br. at 18. As the Federal-Defendants admit, however, the modifications to ferry service under the No Action Alternative would not result in improved ferry service. *See* Fed.-Defs.' Br. at 18 ("It was acknowledged that mainline service was to be reduced because the [Southeast Alaska Transportation Plan] calls for the phasing out of two of the current mainline vessels."). The Record of Decision for the project likewise states that the "No Action Alternative is a projection of how the State will reduce costs by providing somewhat reduced service." Ex. 52 at 41; *see also* Ex. 46 at 37 ("The No Action Alternative is a reduction below the current level of service due to reduced mainliner frequency in Lynn Canal."). In addition, the project manager for the Juneau Access Project, Reuben Yost, specifically stated that the No Action Alternative "won't be very good service or very economical for the state." Ex. 33 at 1. This reduced, admittedly inadequate service is not the same as an improved ferry service alternative.

4

In addition, the State argues that the National Environmental Policy Act only requires consideration of a range of alternatives and that Alternatives 4A through 4D are substantially similar to the alternative Plaintiffs submitted in their Final EIS comments. *See* State's Br. at 6, 9-10. Although the State is correct that an agency need not consider every conceivable alternative to a proposed action, the Ninth Circuit has repeatedly required agencies to "look at every reasonable alternative within the range dictated by the nature and scope of the proposal." *'Ilio 'Ulaokalani Coal.*, 464 F.3d at 1095. "The existence of reasonable but unexamined alternatives renders an EIS inadequate." *Id.*; *see also e.g.*, *Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 813 (9th Cir. 2005); *Morongo Band of Mission Indians*, 161 F.3d at 575. Alternatives 4A through 4D are not substantially similar to improved ferry service using existing boats and terminals because they would all require additional construction of boats, roads, and/or terminals for the Lynn Canal service. *See* Ex. 46 at 46-53. This new construction results in high capital costs that can be avoided through the use of existing assets. Given the stated purpose of reducing costs to the state, those initial costs play a role in making these ferry alternatives less attractive. *See* Ex. 46 at 29 (identifying reducing state costs as an element of the purpose and need for the project). By contrast, a ferry alternative that makes better use of existing assets does not require those significant, initial capital costs and should have been considered.

The State argues, however, that the specific alternative suggested by SEACC in its Final EIS comments is similar to Alternatives 4A through 4D because it would require the construction of a new boat. That boat, the Southern Gateway Shuttle, has long been included in the Southeast Alaska Transportation Plan and would be constructed regardless of any changes in Lynn Canal. It is planned as a boat to serve southern southeast Alaska and SEACC did not suggest using it in Lynn Canal. *See* Ex. 50 at 10. The argument that reliance on the Southern Gateway Shuttle in the alternative proposed by SEACC ignores the cost of that boat largely repeats the justification the Federal Highway Administration has already provided in responding to Plaintiffs' argument. Just as with all of the alternatives considered, any improvements, by road or ferry, within Lynn Canal would have effects on the rest of the ferry system and require reconfiguration of boats or changes in service elsewhere. *See supra* pp. 3-4; *see also* Pls.' Op. Br. at 21-22. Further, Plaintiffs did not argue that the Federal Highway Administration should have considered only the specific alternative outlined in SEACC's Final EIS comments. Rather, the agency should

have considered at least one alternative that provided improved service without building new boats or terminals for Lynn Canal. The Federal Highway Administration did not do so and its justifications for refusing to do so are arbitrary.

## II. FREQUENCY DELAY IS IMPORTANT TO THE AGENCIES ANALYSIS OF ALTERNATIVES AND PRESENTS A MISLEADING ANALYSIS TO THE PUBLIC.

Frequency delay, explained as both the amount of time a person waits between ferry departures and as a measure of convenience, is an important factor in the transportation agencies' comparison of and choice among alternatives. *See* Pls.' Op. Br. at 23-25. Federal-Defendants and the State continue to argue that the excessive frequency delay times used in the Final EIS are justified as a measure of wait time and convenience. *See* Fed.-Defs.' Br. at 21; State's Br. at 13. Like the Final EIS and the Record of Decision, however, the Defendants still fail to address the repeated and unanimous criticism by agency officials and other experts that these values were overstated, both as a measure of wait time and of convenience. The transportation agencies were obliged to disclose the controversy regarding their frequency delay methodology and its significance to their analysis and comparison of alternatives. *See Natural Res. Def. Council v. U.S. Forest Serv.*, 421 F.3d 797, 812-13 (9th Cir. 2005); Pls.' Op. Br. at 21-22. They have not done so and their failure to disclose this flawed methodology is arbitrary in violation of the National Environmental Policy Act. Instead of addressing this failure, the Defendants recite a series of alterations made to the methodology over time and argue that there was no error, or that frequency delay was not significant to their analysis. These arguments misconstrue or fail to respond to Plaintiffs' arguments and are not supported by the record.

As an initial matter, however, the State criticizes Plaintiffs for waiting to provide a critique of frequency delay (the Smart Mobility Report) until the comment period for the Final EIS. *See* State's Br. at 16. As with the similar assertion about alternatives, the claim is incorrect and ignores repeated attempts to call the issue to the agencies' attention and the agency's own awareness of the problem. In fact, SEACC submitted a report including a critique of the agencies' use of frequency delay in 1997, with comments on the Draft EIS. *See* Ex. 89 at 2, 6; Ex. 22 at 6-9 (Erickson report prepared for Alaska Marine Highway System and submitted with SEACC's Draft EIS comments). SEACC again raised these concerns in comments on the Supplemental Draft EIS. *See* Ex. 94 at 3-5. That SEACC and others repeated these concerns and offered additional support in their comments regarding the Final EIS cannot now be used to

suggest that SEACC waited until the end.  *See* Ex. 50 at 18-19, 38-58.  In addition, the agency itself had long been aware of concerns with this issue.  *See* Pls.' Op. Br. at 7-9 (describing critiques of frequency delay).  Plaintiffs' full participation satisfies any requirement to raise the issue during the environmental review process.  *See Great Basin Mine Watch*, 456 F.3d at 965; *Native Ecosystems Council v. Dombeck*, 304 F.3d 886, 899-900 (9th Cir. 2002).[2]

      A.      <u>The Federal Highway Administration Failed to Disclose a Significant Problem.</u>

Federal-Defendants fail entirely to respond to Plaintiffs' basic argument that the transportation agencies' never addressed or described the consistently repeated criticism of its exaggerated analysis of frequency delay and instead merely assert that the agencies' conclusions were not arbitrary.  *See* Fed.-Defs.' Br. at 21-22.  This response avoids entirely the agency's failure to disclose a significant issue relating to the choice of alternatives in violation of the National Environmental Policy Act.  *See* Pls.' Op. Br. at 23; *see also Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 964 (9th Cir. 2005) (agencies must make "up-front disclosures of relevant shortcomings in the data or models" they rely on).

For its part, the State makes two attempts to address this argument.  First, it argues that the inclusion of a sensitivity analysis in an appendix to the Supplemental Draft EIS and Final EIS provides a full disclosure of the issue.  *See* State's Br. at 14-15.  The body of the Record of Decision and the EIS include no explanation of the importance of frequency delay to the agencies' analysis of user benefits and ranking of alternatives and no disclosure of the repeated expert criticism of the methodology.  But the appendix to the EIS does not in any way disclose or explain that frequency delay has been subject to repeated expert criticism, or explain why it is important to and skews the comparison of alternatives in favor of roads.  *See* Ex. 40 at 102-03. At best, Table XXXIV in the appendix discloses to the sophisticated analyst that frequency delay is a significant factor in the agencies' net present value calculations.  *Id.*  This limited table, without further explanation, does not cure the skewed presentation of information and analysis of alternatives in the Final EIS.  Even if it did include a fuller disclosure, relegating such a

---

[2] The State also asserts that Plaintiffs did not raise any concerns with the User Benefits analysis in their Complaint.  State's Br. at 18, n.76.  This is not true.  Plaintiffs specifically raised the issue of the ranking of alternatives according to net present value at ¶ 95.  *See* Compl. (Doc. 1, filed Aug. 16, 2006 at p. 21).

significant issue to an appendix violates the National Environmental Policy Act. *See Lands Council v. Powell*, 395 F.3d 1019, 1031-32 (9th Cir. 2005) (disclosure of shortcomings in an appendix is not sufficient under the National Environmental Policy Act).

The State also alleges that the failure to disclose the controversy over and impact of the skewed frequency delay methodology was cured because the agencies included a life cycle cost analysis as well. *See* State's Br. at 23. The life cycle cost analysis, an additional measure of user benefits, is a separate analysis and does not address frequency delay. As the State recognizes, the agency based its decision and its analysis of alternatives on more than one factor including purpose and need, user benefits, and life cycle costs. *See id.* Frequency delay skewed the analysis of purpose and need factors and user benefits, the only two analyses that support the agencies' decision.[3] The State's argument amounts to a contention that even if two of the three ways in which the agencies compared alternatives were flawed as a result of frequency delay, the inclusion of the third comparison remedies the misleading analysis in the other two. This argument in no way responds to the failure to disclose the reliance on a significant and misleading factor in the other two comparisons.[4]

    B.    <u>Frequency Delay is an Important Factor in the Agencies' Comparison of Alternatives.</u>

The State presents additional arguments that misconstrue or fail to respond to Plaintiffs' argument. First, the State argues that Plaintiffs rely on Table XXXIV to show that frequency delay should be eliminated entirely. *See* State's Br. at 21-22. This misconstrues Plaintiffs' argument. Plaintiffs point to Table XXXIV to show the significance of frequency delay to the analysis of alternatives, not to argue that frequency delay should have been eliminated completely. *See* Pls.' Op. Br. at 23-24. When it is eliminated, the ranking of alternatives

---

[3] As the State recognizes, under the life cycle cost analysis, at least in some respects, ferry alternatives come out ahead. *See* State's Br. at 23.

[4] To the extent this is an argument that any error in frequency delay was harmless, that argument is not persuasive. A harmless error analysis is applicable "only when a mistake of the administrative body is one that *clearly* had *no bearing* on the procedure used or the substance of the decision reached." *Natural Res. Def. Council*, 421 F.3d at 807 (quoting *Gifford Pinchot*, 378 F.3d at 1071). Neither the State nor Federal-Defendants argue that the agencies did not consider net present value and demand, which are skewed by frequency delay.

8

changes dramatically, demonstrating the overriding importance of this single factor. Defendants do not dispute that frequency delay has a significant effect on the ranking of alternatives.

Despite this demonstration of the importance of frequency delay and the agencies' repeated assertions that frequency delay has an important effect on predictions of traffic demand, the State seeks to use the Smart Mobility Report to argue that frequency delay is not significant after all. *See* Pls.' Op. Br. at 24-25 (discussing importance of frequency delay to demand). The State points to the Report's estimated drop of 30 annual average daily trips in the predicted demand for Alternative 2B when frequency delay is eliminated. *See* State's Br. at 16. But 30 trips per day, almost 11,000 trips per year, is a significant drop, representing almost 40% of the demand for current service. *See* Ex. 50 at 42. The Smart Mobility Report does not, therefore, contradict the agencies' repeated assertions. Rather, it confirms that frequency delay has an important effect on predictions of traffic demand, which the agencies identified as one of the most important elements of the purpose and need. *See* Pls.' Op. Br. at 24-25; Ex. 52 at 1-2.

C.     Experts Repeatedly Criticized Frequency Delay as Overstated.

The State bases its argument on the contention that there was a disagreement among experts and that the Federal Highway Administration was therefore entitled to rely on its own experts. *See* State's Br. at 14. First, to the extent there was a dispute, it underscores the need to disclose that controversy in the EIS. *See Native Ecosystems Council*, 418 F.3d at 964-65. That the agency is entitled in the end to make a decision is not relevant to Plaintiffs' claim.

There was, however, no disagreement among the experts on this point. Rather, from the beginning of the process, every expert consulted repeated the same criticism: the frequency delay calculations used by the agencies present unrealistic wait times and overstate the value of inconvenience. *See* Pls.' Op. Br. at 8-9; Ex. 9 at 4 (McDowell critique); Ex. 22 at 6-7 (Erickson Report prepared for AMHS); Ex. 23 at 3-4, 7 (Marshall & Assocs critique); Ex. 50 at 40 (Smart Mobility Report). Despite repeated criticism, the agencies failed to meaningfully address this problem and disclose the controversy over frequency delay calculations, which experts concluded skewed the agencies' analysis of alternatives, making road alternatives appear artificially superior in violation of the National Environmental Policy Act. *See Natural Res. Def. Council*, 421 F.3d at 811; *N.W. Envt'l Advocates v. Nat'l Marine Fisheries Serv.*, 460 F.3d 1125, 1143 (9th Cir. 2006) ("We have recognized that inaccurate economic information may defeat the purpose of an . . . [EIS] by impairing the agency's consideration of the adverse environmental

effects and by skewing the public's evaluation of the proposed agency action." (internal quotation marks and citation omitted)).

The State cites a memo prepared by Jim Calvin for the Federal Highway Administration and Alaska DOT.  *See* State's Br. at 17 (citing Calvin Memo responding to Smart Mobility Report).  The memo the State cites, however, simply repeats that frequency delay is "much more than waiting time."  Ex. 51 at 4.  It is also a "convenience factor."  *Id.*  This repetition of the same explanation does not create a disagreement among experts.  It ignores the consistent critiques that, both as a measure of waiting time and as a measure of convenience, frequency delay is overstated.  The memo also states that it is more important that "the combined computation" be consistent and the impact of frequency delay be in proper proportion to other variables.  *See* State's Br. at 17.  As every expert to consider frequency delay recognized, however, the model by which frequency delay was calculated was itself skewed so that the resulting times were overstated.  The experts' concern was exactly that—frequency delay is overstated and its impact on ferry alternatives is disproportionate to its impact on roads. *See, e.g.*, Ex. 22 at 8-9 (Erickson report noting the dramatic reduction in user benefits when frequency delay is eliminated); Ex. 50 at 40 (Smart Mobility Report indicating that the strictly linear relationship employed in the frequency delay model exaggerates the effect of inconvenience).  This repeated criticism should have been disclosed and addressed in the Final EIS.

D.     The Changes in the Frequency Delay Model Do Not Address the Flaws.

Both Federal-Defendants and the State recite changes to the frequency delay model and argue that these alterations address the experts' concerns.  Once again, this response does not address the failure of the Final EIS to disclose the issue.  Nonetheless, the changes cited were either abandoned or are not relevant.  Even after the Federal Highway Administration and Alaska DOT explored changes to the methodology, the agencies received the same criticism but still failed to disclose it.  *See* Ex. 94 at 3-5 (SEACC SDEIS comments); Ex. 50 at 40-41 (Smart Mobility Report).

First, Defendants note that frequency delay was capped based on the cost of air fare among the Lynn Canal communities.  *See* Fed.-Defs.' Br. at 20-21; State's Br. at 18-19.  That cap was abandoned in the Supplemental Draft EIS.  *See* State's Br. at 18-19.

10

Instead, the frequency delay times in the Final EIS were calculated based on a 16 hour day. *See* Pls.' Op. Br. at 8.[5]  Adopting a 16 hour day reduced frequency delay, but still results in frequency delay times of nine hours for some alternatives.  This was again criticized because it overstated wait time and convenience, skewing the analysis in favor of roads.  *See* Ex. 50 at 40.

Federal-Defendants and the State also refer to changes in the dollar value placed on time. *See* Fed.-Defs.' Br. at 21; State's Br. at 20.  While this reduction changes the dollar value attributed to travel time and to wait time across the board, it does nothing to address the excessive length of frequency delay times assigned to ferry alternatives compared to roads under the agencies' skewed model and is not relevant to the problem that the amount of time itself is overstated.  This addressed a separate criticism the agencies had received that the value of time was also too high (both for frequency delay and for the time spent actually in transit), but it does not remedy or disclose the misleading frequency delay calculations.  Ex. 22 at 8-9 (Erickson).

Finally, the State points to the discount rate applied to user benefits but fails to explain how this discount rate cures, or is even relevant to, frequency delay.  *See* State's Br. at 20.

III.    THE FEDERAL HIGHWAY ADMINISTRATION VIOLATED THE ADMINISTRTATIVE PROCEDURES ACT BY APPROVING A ROAD THAT MAY VIOLATE THE BALD AND GOLDEN EAGLE PROTECTION ACT.

Defendants concede that construction and operation of the proposed highway could result in the disturbance of eagles, but argue that those concerns rely on outdated comments and that the agencies have effectively dealt with those concerns through mitigation measures to avoid any likelihood of disturbance.  *See* Fed.-Defs.' Br. at 25-26; State's Br. at 24-25.[6]  On the contrary,

---

[5] The 16 hour day was adopted as an attempt to account for the difficulty of predicting when users would prefer to travel.  Previously, the agencies had attempted to guess when users would prefer to travel based on peak traffic in Haines and Juneau.  Those peaks proved unrealistic and tended to maximize frequency delay.  *See* Ex. 22 at 6-7.  The agencies abandoned this approach and instead assumed a 16 hour day, corresponding with two shifts of ferry workers and the number of hours of daylight (when most people prefer to travel) during the summer.  *See* Ex. 40 at 59.

[6] Plaintiffs demonstrated that the Court should address their Bald and Golden Eagle Protection Act claim because the Ninth Circuit has authorized claims under the Administrative Procedures Act alleging violations of the Migratory Bird Treaty Act, which is analytically identical to the Bald and Golden Eagle Protection Act for the purpose of determining whether a cause of action is appropriately asserted against a state or federal agency.  *See* Pls.' Op. Br. at 29 n.12.  The Defendants suggest that the Bald and Golden Eagle Protection Act should not apply to them because "whoever," as defined in the criminal provisions of the Act, does not clearly include

(footnote continued…)

the transportation agencies have not addressed in any substantial way disturbance from operation and maintenance of the road and the agencies' statements in the Final EIS and the Record of Decision show that concerns related to disturbance from those sources remain. As to construction, Plaintiffs recognize that the agencies adopted mitigation measures targeted to avoid disturbance from construction, but focused on disturbance from windthrow, which has not been adequately addressed.

Defendants' responses do not address the main problem—impacts from operation and maintenance of the road. The Final EIS recognizes a number of concerns regarding the effects of operation of the road and those concerns were never addressed by mitigation measures. *See, e.g.*, Ex. 40 at 151 ("Increasing summer traffic volumes after the nest selection period (March 1 to May 31) could also increase disturbance levels and decrease the value of a nest site. . . . Displaced eagles would either have to use alternative nest sites in their own territories, compete with already established birds for nesting territories elsewhere, avoid competition by settling for a nest site in marginal habitat, or forgo breeding efforts for the season."); *id.* ("Operation of the highway would involve a persistent source of noise disturbance that may result in the relocation of individual eagle pairs to alternate nest trees within their territory. Individual eagle pairs may even abandon their nest site and associated hunting perches altogether, especially during the summer months when traffic volumes are predicted to peak."). In the end, the Bald Eagle Technical Report and the Final EIS conclude that, although long-term population level effects to eagles are not likely, even with mitigation measures in place there will be "chronic" disturbance from highway traffic and maintenance. *See* Ex. 91 at 4; *see also* Ex. 46 at 82. Some eagles may habituate to the disturbance "while others apparently do not adapt as well to chronic disturbance" and may abandon their nesting territory altogether. Ex. 91 at 4; *see also* Ex. 46 at 82. The

_____

(...footnote continued)
federal agencies or the state. *See* Fed.-Defs.' Br. at 23 n.24; State's Br. at 25 n.126; *see also* 16 U.S.C. § 668c. The D.C. Circuit has addressed this very question in the context of the Migratory Bird Treaty Act. *See Humane Soc'y of the United States v. Glickman*, 217 F.3d 882, 886-87 (D.C. Cir. 2000). The Ninth Circuit implicitly approved of this analysis in authorizing a civil suit against a federal agency in *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1203-04 (9th Cir. 2004). Therefore, a similar claim under the Bald and Golden Eagle Protection Act should be allowed.

Record of Decision repeats these conclusions, recognizing that "[u]se of the highway will create a persistent source of noise that may affect individual eagle pairs." Ex. 52 at 7 (ROD at 7).[7]

The Bald and Golden Eagle Protection Act prohibits disturbance of even one eagle for a single nesting season and does not require population level effects. *See* Pls.' Op. Br. at 29-30; *see also* 16 U.S.C. § 668c; 50 C.F.R. § 22.3. The Federal Highway Administration's repeated recognition, including in its final analysis that the operation of the highway will result in chronic disturbance to eagles demonstrates that the highway can reasonably be expected to cause eagles to abandon their nests in violation of the Act. *See* 72 Fed. Reg. 31,132, 31,133-36 (June 5, 2007).

The mitigation measures adopted by the agencies on which Defendants rely primarily address construction of the road. *See* Ex. 52 at 14 (listing mitigation measures). To the extent the measures might address operation, they will not prevent impacts. One of the mitigation measures on which they rely, *see* Fed-Defs.' Br. at 28; State's Br. at 25, requires Alaska DOT to fund aerial surveys for five years "from the beginning of construction to assess the impact, if any, of the project on the Lynn Canal bald eagle population." Ex. 52 at 17 (ROD at 17). The transportation agencies do not anticipate completing construction of the project within five years, however, so this monitoring requirement is not likely to document the effectiveness of mitigation measures against operation of the road. Even if monitoring were required once the road is in operation, the monitoring requirement does not indicate what, if any, steps the agencies would take if disturbance is observed. Monitoring alone cannot prevent disturbance from taking place.

---

[7] The Fish and Wildlife Service expressed concerns with the long-term degradation of eagle nesting habitat from the operation of the road in its comments on the Supplemental Draft EIS. *See* Ex. 46 at 134D. Defendants argue that those concerns were adequately addressed. *See* Fed.-Defs.' Br. at 26; State's Br. at 24-25. The Fish and Wildlife Service comments on the Supplemental Draft EIS particularly noted the degradation of habitat for nests within a 330-foot buffer zone. *See* Ex. 46 at 134D. The Bald Eagle Technical Report indicates that 53% of the eagle nests in the project area will still be within this buffer zone. *See* Ex. 95 at 6. The Fish and Wildlife Service submitted only brief, general comments on the Preliminary Final EIS. Those comments state that Alternative 2B "would impact the most productive and sensitive habitats" along east Lynn Canal. *See* Ex. 46 at 143A. Therefore, the agency supported "an alternative that would result in the least amount of environmental damage to these productive areas" instead of Alternative 2B. *Id.* These comments are consistent with the agency's earlier comments raising concerns with the long-term degradation of eagle nesting habitat and do not indicate that Fish and Wildlife no longer expects eagles are likely to be disturbed as a result of the project.

13

The State also refers to Alaska DOT's commitment to assess natural screening during construction as a way to avoid disturbance for nests within 330 feet of the road. *See* State's Br. at 25. Screening, however, would not address the agencies' concern with noise from the operation of the road. The documents cited by the State reflect an understanding that screening would be used to shield the nests from the road visually where natural screening was insufficient. *See* Ex. 90 at 1. There is no indication that this screening would prevent or reduce noise to eliminate the likelihood of disturbing eagles from the operation of the road, particularly during peak traffic in the summer when eagles may be nesting. *See* Ex. 40 at 151 (identifying noise from peak traffic as a source of concern); Ex. 52 at 14 (when nests are active, activities near nests are limited until after August 31).

Federal-Defendants' argument that the Federal Highway Administration and Alaska DOT adequately addressed any potential impacts to eagles from construction of the road is also not persuasive. In this regard, Plaintiffs focused on the issue of the loss of nests from windthrow. Though Defendants go on at length about a variety of construction-related mitigation measures, in the end their only responsive argument is that they have agreed to assess and stabilize trees where clearing occurs within 100 feet of a nest tree. *See* Fed.-Defs.' Br. at 26-27; *see also* Ex. 52 at 14. As Plaintiffs stated in their Opening Brief, and as the transportation agencies explicitly recognized, it is "very difficult, if not impossible" to quantify the increased risk to trees from wind effects. Ex. 40 at 149; Pls.' Op. Br. at 12. Federal-Defendants recognize this admission but assert, without support, that it is only difficult to assess increased risk during the preliminary engineering stage of the project. *See* Fed.-Defs.' Br. at 27. In fact, the Supplemental Draft EIS also committed to stabilize trees on a case-by-case basis during design and construction of the project, yet the Fish and Wildlife Service explicitly questioned how this "case-by-case" assessment of impacts from windthrow could be accomplished. *See* Ex. 46 at 134D; *see also* Ex. 95 at 4. Given the difficulty of assessing the risk to particular trees from windthrow, this measure does not address the likelihood that some nest trees will be lost because of the increased risk of wind effects from clearing for the road. *See* Ex. 15 at 3 (an east Lynn Canal highway has "the likelihood to result in violation of the Bald Eagle Protection Act"); Ex. 25 at 5 ("Some nests located near the right-of-way are likely to be lost due to windthrow or blow down."); Ex. 40 at 149 (it is "very difficult, if not impossible" to quantify the increased risk to trees from wind effects).

IV.     THE FOREST SERVICE'S APPROVAL OF A RIGHT-OF-WAY THROUGH OLD-GROWTH HABITAT VIOLATES THE NATIONAL FOREST MANAGEMENT ACT.

Federal-Defendants and the State argue that the Forest Service was not required to assess the feasibility of other routes before authorizing an easement right-of-way through designated Old-growth Habitat reserves in Berners Bay. *See* Fed.-Defs.' Br. at 11; State's Br. at 26. First, the defendants argue that the Tongass Land Management Plan (Tongass Plan) does not require a feasibility analysis. *See* Fed.-Defs.' Br. at 12-13; State's Br. at 26. Second, Federal-Defendants argue that an unrelated provision of the Safe, Accountable, Flexible, Efficient Transportation Equity Act, A Legacy for Users, Pub. L. 109-59 (2005) (SAFETEA-LU) overrides any requirements in the Tongass Plan. *See* Fed.-Defs.' Br. at 14-15. Both arguments are incorrect.

Federal-Defendants and the State offer differing interpretations of the Tongass Plan to support their assertions that no feasibility analysis was required. The State argues that because the Juneau Access Project is a major highway, it should be exempt from the standards and guidelines applicable to Old-growth Habitat under the Tongass Plan. *See* State's Br. at 26. It suggests that roads such as logging roads should be treated differently from major highways. *Id.* There is no support for this interpretation. The management prescriptions for Old-growth Habitat reserves refer to roads and transportation generally and are not limited to logging roads. *See* Ex. 61 at 42 (stating that "[n]ew road construction is generally inconsistent with Old-growth Habitat Land Use Designation objectives"). Furthermore, the State offers no clear reason that major highways would be permitted in Old-growth Habitat Land Use Designation areas if logging roads are not. The State does not show that major highways would have less severe impacts on the wildlife values that Old-growth Habitat is intended to protect. *See* Pls.' Br. at 10 (discussing importance of Old-growth Habitat for wildlife). If, as the State seems to concede, a feasibility analysis would have been required for any other type of road through the Old-growth Habitat in Berners Bay, then it makes little sense to find that major highways are exempt from those requirements.

Federal-Defendants argue that the Tongass Plan distinguishes between Transportation and Utility System corridors designated at the time the plan was adopted and those identified later. *See* Fed.-Defs.' Br. at 13. The language of the Tongass Plan only distinguishes between existing corridors, where actual construction has been initiated, and those corridors where actual construction has not yet occurred. *See* Ex. 61 at 45. Once actual construction begins, the

15

corridor becomes an existing Transportation and Utility Systems corridor and the standards and guidelines applicable to the Transportation and Utility Systems Land Use Designation govern the corridor. Ex. 61 at 45 ("Upon initiation of construction, and during system operation, this management prescription [for Transportation and Utility Systems] will apply."). Before "actual construction of new systems occurs," the management prescriptions for the initial Land Use Designation apply. *Id.* Whether a corridor was proposed at the time the Tongass Plan was adopted or years later, it is not an existing corridor until actual construction begins. In this case, the initial Land Use Designation for the areas at issue is Old-growth Habitat. *See* Ex. 61 at 69. The management criteria for the Old-growth Habitat Land Use Designation specifically require that the Forest Service conduct an analysis "to determine if other feasible routes avoiding this Land Use Designation exist during the project environmental analysis process" before allowing construction of a new road. Ex. 61 at 42. No such analysis was completed.

Federal-Defendants also argue that the forest-wide standards and guidelines of the Tongass Plan exempt this project from the management criteria applicable to Old-growth Habitat because the project is in a Transportation and Utility Systems "window." *See* Fed.-Defs.' Br. at 13. Even if the Juneau Access corridor is in a window,[8] the Forest Service must still comply with the specific requirements of the Old-growth Habitat management prescriptions. *See* Ex. 97 at 7 (where there is a conflict between the forest-wide standards and guidelines and the standards and guidelines for a specific Land Use Designation, the specific management prescriptions control). According to these same forest-wide guidelines, windows apply only where "the applied management direction will not conflict with future designation" of a Transportation and Utility System. *See* Ex. 61 at 56. Thus, if an area is to be treated as a window, as argued by Federal-Defendants, it means only that it is no longer an avoidance area and becomes an area "potentially available" for a Transportation and Utility System, provided such use does not conflict with the management direction for the underlying Land Use Designation. *Id.* Since each Land Use Designation has a different set of standards and guidelines, the Forest Service must separately determine that a road would not conflict with those area-specific management

---

[8] It is not clear the provision cited by Federal-Defendants applies because it depends on whether the corridor is "allocated" to a particular Land Use Designation. As explained above, the standards for the Transportation and Utility System Land Use Designation only apply to existing corridors, where actual construction has already begun. *See supra* pp. 15-16.

prescriptions.  The limitations on road construction are different in various Land Use Designations.  *Compare, e.g.*, Ex. 97 at 14,16 (providing that Research Natural Areas are Transportation and Utility System avoidance areas, but that roads may be constructed if "they contribute to the objectives or the protection of the area") *with* Ex. 97 at 21, 23 (Special Interest Areas are Transportation and Utility System avoidance areas, but transportation objectives for the areas are to "[p]rovide and manage a transportation system compatible with, or which will improve the interpretation of, the unique values of the Special Interest Area").  The standards and guidelines for the Old-growth Habitat Land Use Designation, which govern the areas at issue here, provide that the Forest Service must determine that no feasible alternatives are available before allowing construction through this Land Use Designation.  Ex. 61 at 42.

Finally, Federal-Defendants argue that no feasibility analysis is required because section 4407 of SAFETEA-LU, Ex. 67 at 2, exempts the Juneau Access project from the National Forest Management Act.  *See* Fed.-Defs.' Br. at 14-15.  They further suggest that this provision would exempt the project from the "locational restrictions" of any other environmental statute, including the Endangered Species Act and the Bald and Golden Eagle Protection Act. *See* Fed.-Defs.' Br. at 15 n.14.  Under Federal-Defendants' interpretation, all of the hundreds of log transfer facilities, marine access points, and roads shown on the map referenced in the provision would be exempt from these environmental statutes—even corridors that Federal Defendants concede the State may never need.  *See* Fed.-Defs.' Br. at 14-15.  In support of this sweeping interpretation, the Federal Defendants can only point to the fact that this provision appears in a general highway statute.  Fed.-Defs.' Br. at 14.

Federal-Defendants' interpretation focuses entirely on the portion of the statute that reads "notwithstanding any other provision of law." As they recognize, however, Fed.-Defs.' Br. at 14, "notwithstanding" phrases are not dispositive and courts regularly interpret similar language to be narrower than the potential scope of the phrase.  *See United States v. Novak*, 476 F.3d 1041, 1046 (9th Cir. 2007) (noting that "notwithstanding any other provision of law" phrases are "not always construed literally" and must be read in context); *N.W. Forest Res. Council v. Pilchuck Audubon Soc'y*, 97 F.3d 1161, 1166-67 (9th Cir. 1996) (finding that similar "notwithstanding" language did not preempt National Forest Management Act regulations where nothing in the language indicated an intent to preempt those regulations).  Courts consider the language and structure of the statute and the relevant legislative history in interpreting the scope of such

phrases. *See, e.g.*, *N.W. Forest Res. Council*, 97 F.3d at 1166-67 (considering language of Rescissions Act); *In re Glacier Bay*, 944 F.2d 577, 582-83 (9th Cir. 1991) (examining structure of provisions of conflicting laws); *Miller v. United Food & Commercial Workers Union*, 708 F.2d 467, 470-71 (9th Cir. 1983) (considering legislative history).

Similarly, repeals by implication are disfavored. *See, e.g.*, *Hagen v. Utah*, 510 U.S. 399, 416 (1994); *N.W. Forest Res. Council*, 97 F.3d at 1167 ("An implied repeal of the underlying statutory and regulatory provisions governing the timber sale contracting process may be found only if no other construction is possible."). Courts will not read a later provision to override an earlier provision unless the two provisions are in "irreconcilable conflict." *In re Glacier Bay*, 944 F.2d at 581; *see also Russel v. Hug*, 275 F.3d 812, 817 (9th Cir. 2002).

First, nothing in the language of the SAFETEA-LU provision indicates that Congress intended the "notwithstanding" provision to protect this particular decision or action from all environmental laws.[9] It simply refers to a map and "enacts into law" the rights-of-way and easements depicted on the map. That map includes hundreds of transfer facilities, marine access points, and roads all over southeast Alaska. *See* Ex. 66 (map 92337). It is difficult to imagine that Congress, with no discussion, found each of these routes of such paramount importance that it enacted this provision with the intention of overriding any environmental statute that might present "locational restrictions" even though the state, as Federal-Defendants concede, may have no use for the rights-of-way. *See* Fed.-Defs.' Br. at 15.

---

[9] The Federal-Defendants cite to *Bald Eagle Ridge Protection Ass'n v. Mallory*, 119 F. Supp. 2d 473 (M.D. Pa. 2000) in support of their position. In that case, however, Congress specifically referred to one particular project and provided a detailed statement requiring the Federal Highway Administration to approve that project and authorizing the state to proceed:

> Notwithstanding any other provision of law, the Secretary [of Transportation] shall approve, and the Commonwealth of Pennsylvania is authorized to proceed with, engineering, final design, and construction of Corridor O of the Appalachian development highway system between Bald Eagle and Interstate Route 80 (as redefined by this Act). All records of decision relating to Corridor O issued prior to the date of enactment of this Act shall remain in effect.

*Id.* at 477 (citing Pub. L. No. 105-178, § 1212(o) (1998)). The provision at issue in this case, however, gives no indication that Congress had any specific intention related to anything on the map.

Second, as Federal-Defendants recognize, there is no legislative history reported for this provision. *See* Fed.-Defs.' Br. at 14. It was inserted with no discussion in the last version of the transportation bill before the legislation was passed.

Finally, though Federal-Defendants are correct to suggest that the context of the highway statute in which the provision appears offers some guidance, they reach the wrong conclusion. *See* Fed.-Defs.' Br. at 14. Section 4407 of SAFETEA-LU is a provision in a highway bill that specifically deals with rights-of-way and there is no indication in the language, structure, or history of the provision that Congress intended it to apply more broadly than that. *See* Ex. 67 at 2 (SAFETEA-LU § 4407).

In fact, Alaska DOT and the Alaska Department of Natural Resources entered into a memorandum of understanding with the Forest Service implementing the SAFETEA-LU provision. Ex. 96 at 1. The memorandum of understanding interprets section 4407 largely as a measure to streamline the process for granting rights-of-way needed by both the state and the Forest Service. *See id.* (noting that the Forest Service and Alaska DOT "each have a need for access and rights across their intermingled ownerships . . . in and around the Tongass National Forest[,]" and the map identifies their respective needs). The memorandum of understanding specifically recognizes, contrary to Federal-Defendants' interpretation of section 4407 in this litigation, that the provision does not displace other laws and that the parties can only grant the easements and rights-of-way identified if it is "consistent with their respective obligations to protect scenic, archaeological, recreation, and fish and wildlife values, resources and habitats on National Forest System lands and State of Alaska lands." *Id.*; *see also id.* at 16, 19, 26 (requiring compliance with Title 23 United States Code for federally funded highways within the rights-of-way and requiring the grantee to "comply with all applicable Federal, State, and local laws, regulations, and standards"). The Court should grant no deference to the agencies' new litigation position that contradicts this understanding. *See Hertzberg v. Dignity Partners, Inc.*, 191 F.3d 1076, 1082 (9th Cir. 1999) ("[w]here an agency expresses its interpretation in a position taken in the course of litigation rather than in a regulation, deference is usually not appropriate").

Moreover, Federal-Defendants acknowledge that not all of the rights-of-way shown on the map will ultimately be granted, *see* Fed.-Defs.' Br. at 15, and the memorandum of understanding recognizes the Forest Service may deny a right-of-way under the second step of the process, provided the denial is not unreasonable. *See* Ex. 96 at 5; *see also id.* at 3-4

(recognizing the state has the right to deny easements for any log transfer facility on the map as long as it offers a reasonable alternative location). Denying a right-of-way for construction is not unreasonable where it cannot be granted in compliance with other obligations, for example, the Forest Service's obligation to determine that no other feasible alternative exists.

Consistent with the agencies' interpretation and with the context in which the provision appears, the phrase "notwithstanding any other provision of law" in the provision should be limited to other provisions about rights-of-way. One such provision is 23 U.S.C. § 317, the usual process by which the Federal Highway Administration acquires rights-of-way necessary for state transportation projects. Under that provision, the Federal Highway Administration must determine that land is reasonably necessary for a highway and must provide a map of the land needed to the agency with jurisdiction over that land. 23 U.S.C. § 317(a). Section 4407 of SAFETEA-LU identifies potentially appropriate rights-of-way for highways and provides a map of those rights-of-way. In so doing, it may exempt the corridors shown on the map from the process described in 23 U.S.C. § 317(a), or other similar provisions, but should not be read to displace the requirements of other unrelated laws, such as the National Forest Management Act, that do not conflict with the provision.

## V. THE FEDERAL HIGHWAY ADMINISTRATION FAILED TO INITIATE FORMAL CONSULTATION AS REQUIRED UNDER THE ENDANGERED SPECIES ACT.

Federal-Defendants concede that there is a "potential" for adverse effects to sea lions from the project, but argue that the agencies concluded that adverse effects were unlikely. Fed.-Defs.' Br. at 33-34. In fact, there is no dispute in the record that, in the absence of mitigation measures, the agencies concluded that the project was likely to have an adverse effect on Steller sea lions. *See, e.g.*, Ex. 13 at 1 (1996 letter from the Service advising that an East Lynn Canal road "is likely to adversely affect Steller sea lions"); Ex. 46 at 158 (Final EIS Steller sea lion technical report stating that "peak noise levels are likely to disturb Steller sea lions," even with mitigation measures in place); Ex. 46 at 201 (National Marine Fisheries Service stating that "it is likely that loud, pulsed, frequent or unfamiliar noises, such as blasting or driving pilings, are likely to disrupt resting sea lions or animals foraging near the sound source"). The National Marine Fisheries Service specifically conditioned its concurrence that the project is not likely to adversely affect Steller sea lions on the Federal Highway Administration's acceptance of additional mitigation measures. *See* Ex. 46 at 206; Ex. 40 at 179-80. The Federal

Highway Administration's ultimate conclusion that the project is not likely to adversely affect sea lions can only be sustained if the mitigation measures adopted are sufficient to avoid the recognized adverse effects. The measures adopted are not adequate to avoid those effects because they are largely monitoring requirements that effectively postpone formal consultation until some point after the project is underway, when adverse effects have already occurred, or because they are waivable or uncertain to occur.

Defendants' focus on certainty avoids Plaintiffs' argument that the Endangered Species Act sets a low threshold for triggering formal consultation. The consultation provisions of the Endangered Species Act require agencies to "insure against . . . harm before it occurs." *Greenpeace v. Nat'l Marine Fisheries Serv.*, 106 F. Supp. 2d 1066, 1074 (W.D. Wash. 2000). "A finding of 'not likely to adversely affect' can be made only if the effects of the proposed action on the listed species are expected to be 'discountable, or insignificant, or completely beneficial.'" *Nat'l Wildlife Fed'n v. Fed. Emergency Mgmt. Agency*, 345 F. Supp. 2d 1151, 1168 n.16 (W.D. Wash. 2004). When the agency relies on mitigation measures, those measures "must be 'reasonably specific, certain to occur, and capable of implementation; they must be subject to deadlines or otherwise-enforceable obligations . . . .'" *Natural Res. Def. Council v. Kempthorne*, 506 F. Supp. 2d 322, 350 (E.D. Cal. 2007). In addition, the agency must have "a rational reason to expect them to work." *In re Operation of Mo. River Sys. Litig.*, 421 F.3d 618, 635 (8th Cir. 2005). Where the agencies have admitted that they have limited knowledge regarding the likely effects of noise from construction and operation of the road on Steller sea lions and have also stated that, without effective mitigation measures, the project is likely to have an adverse effect on Steller sea lions, they cannot base their determination that the project is not likely to have an adverse effect on mitigation measures that largely provide monitoring requirements or that are waivable and may not occur. Rather, the Federal Highway Administration should have engaged in formal consultation to fully assess and address the effects of the project on sea lions before beginning construction of the project. *See* H.R. Rep. No. 96-697 (1979) (Conf. Rep.) (discussing the best available evidence standard and indicating that the requirement was intended to "permit the wildlife agencies to frame their section 7(b) opinions on the best evidence that is available *or can be developed during consultation*" (emphasis added)).

In this case, the Service specifically required the transportation agencies to agree to additional mitigation measures "[d]ue to concerns that the proposed mitigation measures

included in the [biological assessment] might not be effective in avoiding adverse effects for Steller sea lions or their critical habitat." Ex. 46 at 202. The additional measures required, however, are largely monitoring and reporting requirements. *See id.* at 202-05. For example, under the modified conditions, the transportation agencies must develop a monitoring program, extend the post-construction monitoring program for an additional two years, and monitor for noise levels. *See id.* Federal-Defendants cite to these monitoring requirements as an example of the plan's effectiveness. *See* Fed.-Defs.' Br. at 32. Monitoring does not by itself prevent any adverse impacts from happening, however, nor do Federal-Defendants argue that it will. The additional measures also require the transportation agencies to submit detailed construction plans for the Gran Point area, but only require those plans to be submitted sometime before construction begins at the haulout. *See* Ex. 52 at 15. At that point, however, construction of the proposed road may be well underway and it will be much more difficult to adopt alternatives that would avoid adverse effects.

Other mitigation measures proposed by the Federal Highway Administration and modified by the Service are waivable or uncertain to occur. *See infra* p. 24 (discussing use of vibratory hammers and restrictions on construction near Gran Point).

If the Service could not conclude that sea lions would not be adversely affected by the project without additional mitigation measures, it cannot conclude that there will not be adverse effects on the basis of the new requirements. The additional requirements do not address the "uncertainty in the expected behavioral responses of Steller sea lions to construction activity and road use." Ex. 46 at 202. Without additional, substantive measures to address this uncertainty, the Service could not conclude that the new measures would prevent adverse effects to sea lions.

Nonetheless, Federal-Defendants argue that the "adaptive management" approach to mitigation adopted by the Federal Highway Administration is appropriate precisely because there is a "lack of specifics as to the construction activities" and uncertainty regarding the response of sea lions to the construction and operation of the proposed project. Fed.-Defs.' Br. at 22; *see also* Ex. 46 at 203 ("For [the Service] to evaluate such a project, and insure there would be no adverse effects, much more detailed information on the specifics of the project would need to be provided."). The Federal-Defendants' argument is essentially that the measures are adequate because formal consultation will occur later if adverse effects are observed or if the measures prove unworkable. *See* Fed.-Defs.' Br. at 35 (noting that the Service's concurrence letter

requires initiation of consultation under section 7 of the Endangered Species Act if "potential adverse effects are observed"); *see also id.* at 37 n.35.  Adaptive management may be appropriate where the agencies are able to conclude, at the time of their decision, that adverse effects to a listed species are unlikely based on available information and required mitigation and the adaptive management measures are intended to allow the agencies to re-assess and improve specific, non-discretionary measures over time.  But adaptive management is not appropriate here where the expert agency could not conclude the mitigation measures would prevent all adverse effect and gave its approval based only on monitoring measures that postpone formal consultation until later and on measures that are waivable or not certain to occur.

Federal-Defendants rely principally on two cases to support their argument that this adaptive management approach is appropriate.  *See* Fed.-Defs.' Br. at 36.  In *In re Operation of Missouri River System Litigation*, 421 F.3d 618, 635 (8th Cir. 2005), the agency was required to construct replacement habitat to mitigate the effects of the project, in addition to taking other measures to prevent adverse effects to protected species.  A definite number of acres was required, and the agency demonstrated "a rational reason to expect [the constructed habitat] to work as intended."  *Id.*; *see also S.W. Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, 143 F.3d 515, 518 (9th Cir. 1998) (upholding a similar plan providing that a definite amount of habitat would be provided and establishing non-discretionary deadlines).  The measures required were definite and certain to occur.  In the case of the Juneau Access Project, however, on the basis of admitted uncertainty, the Federal Highway Administration has adopted indefinite mitigation measures that may never be implemented.  This does not satisfy the requirements of the Endangered Species Act.  *See* Pls.' Op. Br. at 32-34; *see supra* p. 21.

In *Selkirk Conservation Alliance v. Forsgren*, 336 F.3d 944, 964 (9th Cir. 2003), also cited by the Federal-Defendants, the agency was required to comply with a comprehensive Conservation Agreement that provided a detailed series of requirements related to road locations and densities, operations and uses, required cover, riparian zones, and habitat for grizzly bears. In fact, the agreement imposed obligations "that go far beyond state and federal laws." *Id.* at 955.  While new information would be analyzed at least annually, the initial mitigation plan required the agency to take quantifiable, non-discretionary measures targeted at the most troublesome threats identified by the agencies, followed by monitoring and re-assessment.  *Id.* at 964-65; 957-58.

Moreover, in all of the cases relied on by Federal-Defendants, formal consultation had taken place, allowing the agencies to fully analyze the information related to the species and to the action at issue to make an informed decision regarding its likely effects before those effects occurred. Here, the agencies have not undertaken formal consultation to give full consideration to the likely effects before construction begins. The Endangered Species Act does not allow the court to simply "trust the agency to protect [Steller sea lions] and [their] habitat." *Natural Res. Def. Council v. Kempthorne*, 506 F. Supp. 2d 322, 356 (E.D. Cal. 2007). Rather, the Federal Highway Administration should have initiated formal consultation to fulfill its obligations under the Endangered Species Act.

Federal-Defendants also argue that the remaining mitigation measures are "certain to occur." Fed.-Defs.' Br. at 35-36. The use of vibratory hammers, however, is explicitly waivable with notification to the Service. *See* Ex. 52 at 15. Federal-Defendants focus in particular on the restriction on construction within 3,000 feet of Gran Point while sea lions are present. *See* Fed.-Defs.' Br. at 32-33. They argue that this restriction is workable because construction in the area of Gran Point, which is located near the northern end of the project, can be completed over several years. *Id.*; *see also* Ex. 46 at 57 (map of proposed project). The project is to be constructed in phases starting near Juneau and working north. *See* Ex. 46 at 244-45. Federal-Defendants' argument assumes that it would be possible to depart from this plan and mobilize construction workers and equipment to this remote portion of the project at any time for a few hours or days, well before there may be a road to access the area, and with no ability to predict in advance whether sea lions will be present. There is no evidence in the record that it would even be possible to construct the project under those circumstances. Furthermore, construction and blasting activities may not be conducted within 330 feet of active bald eagle nests until after August 31st. *See* Ex. 95 at 2. A substantial portion of the period when sea lions are most likely to be absent overlaps with the restrictions on construction activities near eagle nests. *See* Fed.-Defs.' Br. at 35. Given the difficulty of constructing at a remote location in the limited time periods when there are no Steller sea lions at the haulout and no restrictions on construction in the same area because of eagles, it cannot be said that this mitigation measure is "certain to occur" as required by the Endangered Species Act. *See Natural Res. Def. Council v. Kempthorne*, 506 F. Supp. 2d 322, 350 (E.D. Cal. 2007) ("[m]itigation measures must be . . .

certain to occur, and capable of implementation"); *see also N.W. Envt'l Advocates v. U.S. Envt'l Prot. Agency*, 268 F. Supp. 2d 1255, 1273 (D. Or. 2003).

As a whole, the mitigation measures adopted by the agencies are not sufficient to avoid any adverse effects to Steller sea lions. Therefore, the Federal Highway Administration should have engaged in formal consultation with the National Marine Fisheries Service to comply with its obligations under the Endangered Species Act.

## VI.    AN INJUNCTION IS NECESSARY TO PREVENT IRREPARABLE HARM.

Both the Federal-Defendants and the State argue that no injunction is necessary. *See* Fed.-Defs.' Br. at 38; State's Br. at 27. The State argues that no injunction is required because the State will not advertise for construction or begin construction until after this court has issued its ruling and the State will inform Plaintiffs if it plans to proceed with construction after that. State's Br. at 27; *see also* Fed.-Defs.' Br. at 38 (arguing that no injunction is required because the State has not yet entered into a contract for construction). This does not provide a basis for failing to issue an injunction. If the Court determines that the agencies have violated the law, the appropriate remedy is to "vacate the agency's action and remand to the agency to act in compliance with its statutory obligations." *Defenders of Wildlife v. U.S. Envtl. Prot. Agency*, 420 F.3d 946, 978 (9th Cir. 2005). The defendants cannot take action if the Record of Decision is vacated, as requested by Plaintiffs, and an injunction appropriately supports that outcome.

As Plaintiffs have argued, allowing the agencies to proceed with the project at issue would result in irreparable harm that cannot be adequately remedied at law. *See* Pls.' Op. Br. at 35-36; *see also Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable."). Defendants would have to show unusual circumstances to escape an injunction. *See Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 738 n.18 (9th Cir. 2001) (courts should withhold an injunction only in "unusual circumstances"). They have made no attempt to make that showing. If the agencies have violated the law, an injunction is necessary to prevent irreparable injury.

## CONCLUSION

For the foregoing reasons and the reasons discussed in Plaintiffs' Opening Brief, Plaintiffs respectfully request that the Court enter a declaratory judgment that the Federal

Highway Administration has acted arbitrarily in violation of the Administrative Procedures Act, the National Environmental Policy Act, and the Endangered Species Act by approving a Record of Decision and authorizing funding for the proposed project, and a declaratory judgment that the Forest Service has violated the National Forest Management Act by granting an easement right-of-way for the project.  Plaintiffs further respectfully request that the Court vacate the Record of Decision and the decision granting an easement right-of-way and enjoin any and all activity related to construction of the project.

Respectfully submitted this 30th day of June, 2008

s/ Katharine S. Glover
Katharine S. Glover (ABA# 0606033)
Eric P. Jorgensen (ABA# 8904010)
EARTHJUSTICE
325 Fourth Street
Juneau, AK 99801
Ph: 907-586-2751
Fax: 907-463-5891
Email: kglover@earthjustice.org

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I, Katharine S. Glover, certify that on July 1, 2008, a true and correct copy of the foregoing PLAINTIFFS' REPLY BRIEF, and exhibits thereto, was served electronically on Dean K. Dunsmore, Robert P. Williams, and Peter K. Putzier.

s/ Katharine S. Glover
Katharine S. Glover